Vernice **DUBOSE** et al.

v.

Carla **HILLS** et al.

Claudia **WALTER** et al.

v.

Carla **HILLS** et al.

Janette **LITTLE** et al.

v.

Carla **HILLS** et al.

Civ. Nos. H–75–303, H–75–345, H–75–346.

United States District Court, D. Connecticut.

Dec. 15, 1975.

---

Dennis J. O'Brien, Norman K. Janes, Willimantic, Conn., for Dubose and others.

John A. Dziamba, Willimantic, Conn., James C. Sturdevant, Rockville, Conn., for Walter and others.

Joan Pilver, Hartford, Conn., Raymond Norko, Danielson, Conn., for Little and others.

Peter Dorsey, U. S. Atty., Marjorie A. Wilhelm, Asst. U. S. Atty., New Haven, Conn., Paul Michael, Civ. Div., Dept. of Justice, Washington, D. C., Rolland J. Castleman, Manchester, Conn., Guy De-Frances, Meriden, Conn., James H. Shulman, Hartford, Conn., for Hills and others.

## RULING OF PLAINTIFFS' MOTION FOR PRELIMINARY IN-JUNCTION

BLUMENFELD, District Judge.

The plaintiffs in this action are low-income residents of a federally subsidized housing project, Windham Heights Apartments, in Windham, Connecticut.

They complain that the federal[1] and private[2] defendants have denied them, and others similarly situated, rights protected by the fifth amendment, as well as rights created by the National Housing Act[3] as it was amended by the Housing and Community Development Act of 1974,[4] and regulations issued pursuant to that Act.[5] They seek declaratory and injunctive relief, compelling recission of a rent increase[6] and implementation of a presently dormant federal subsidy program.[7] Two similar suits were filed subsequent to the initiation of this action.[8] Temporary restraining orders have been issued in all three cases requiring that HUD pay a portion of the rent increases.[9] These motions for preliminary injunctive relief have been consolidated by agreement of the parties at the suggestion of the court. For purposes of these motions, the plaintiffs have decided not to proceed with their due process claims.[10]

## I.

■■ Jurisdiction is conferred by 28 U.S.C. § 1337. Several courts have held that the National Housing Act, having been enacted pursuant to Congress' commerce power, may be construed under the commerce jurisdiction.[11] I adopt their reasoning. Mandamus jurisdiction is also present, under 28 U.S.C. § 1361. Here, just as in *Langevin v. Chenango Court, Inc.*,[12] the plaintiffs seek an order compelling a hearing on the agency-approved rent increases. Moreover, the plaintiffs seek to compel the Secretary to perform a duty she allegedly owes them—the payment of the subsidies authorized by the 1974 amendments to Section 236.[13] Since jurisdiction is proper-

---

1. The Secretary of Housing and Urban Development, Carla Hills, is sued individually and in her official capacity.

2. The owner of the housing project, Windham Heights Associates, is a limited partnership. The managing agent, Anthony Associates, is a general partnership. Simon Konover is a general partner in both partnerships. All three are named defendants.

3. 12 U.S.C. § 1701 *et seq.* (1970).

4. Pub.L. 93–383, 88 Stat. 633 (1974).

5. 24 C.F.R. §§ 236.1 *et seq.;* §§ 401.1 *et seq.;* and §§ 425.1 *et seq.*

6. The Department of Housing and Urban Development (HUD) approved a $20 per unit rent increase during the summer of 1975, to take effect October 1, 1975.

7. The Housing and Community Development Act of 1974, Pub.L. 93–383, 88 Stat. 633, added a new subsidy program to Section 236, providing for the payment of operating subsidies to certain housing projects assisted under Section 236, 12 U.S.C. § 1715z–1. (Supp. IV, 1974). Section 212 of the Act contained the new program, which now may be found at 12 U.S.C. §§ 1715z–1(f)(3) and (g). (Supp. IV, 1974).

8. *Walter v. Hills*, Civil No. H–75–345 and *Little v. Hills*, Civil No. H–75–346. These cases involve different housing projects, with different plaintiffs private defendants. Although some of the issues are also different, the primary claim in each of these cases is the same as the federal statutory claim at issue here.

9. HUD is paying, as required, "that portion of the approved rent increase which is directly attributable to an increase in taxes and utilities paid by the private defendant" in all three cases. These payments are "for the account of those tenants who are currently spending more than 30% of their adjusted family income towards rent."

10. They have reserved their right to challenge the rent increases at the trial on the merits. *But see Harlib v. Lynn*, 511 F.2d 51 (7th Cir. 1975); *Langevin v. Chenango Court Inc.*, 447 F.2d 296 (2d Cir. 1971); and *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir. 1970).

11. *Davis v. Romney*, 490 F.2d 1360, 1365–66 (3d Cir. 1974); *Bloodworth v. Oxford Village Townhouses, Inc.*, 377 F.Supp. 709, 714–15 (N.D.Ga.1974); *Mandina v. Lynn*, 357 F. Supp. 269, 276 (W.D.Mo.1973). *Cf. Winningham v. United States Department of Housing & Urban Development*, 512 F.2d 617, 621–23 (5th Cir. 1975). *But cf.* the perfunctory rejection of a similar claim that the United States Housing Act of 1937, 42 U.S.C. § 1401 *et seq.*, could be construed under the commerce jurisdiction in *Potrero Hill Community Action Committee v. Housing Authority of the City and County of San Francisco*, 410 F.2d 974, 978–79 (9th Cir. 1969).

12. 447 F.2d 296, 300 (2d Cir. 1971).

13. *See Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975) (Friendly, J. concurring) for a brief discussion of the nature of mandamus jurisdiction, and its relationship to the general federal question jurisdiction in suits against

ly founded upon Sections 1337 and 1361, I need not go through the calculations required to determine whether the housing subsidies sought by each of the plaintiffs here reaches the $10,000 jurisdictional amount required by 28 U.S.C. § 1331.[14] Nor need I discuss the availability of judicial review under 5 U.S.C. § 701 et seq. Declaratory and injunctive relief may be ordered pursuant to 28 U.S.C. §§ 2201 and 2202. These low-income tenants have standing to maintain this lawsuit, since they are clearly within the zone of interests created by Section 236 of the National Housing Act, and the threatened rent increases combined with the denial of the subsidy would harm them financially. As the requirements of Rule 23 are met here, class action treatment is appropriate in all three cases. The plaintiff classes certified consist of those family units now residing, or who may at some future time reside, at one of the three Section 236 housing projects involved in this lawsuit who pay or will pay more than 30% of their "adjusted family income" for rent as of the effective dates of the rent increases challenged here.[15]

## II.

As the plaintiffs have decided not to pursue their constitutional claims at this time, the only issue before me involves the proper interpretation of Section 236 of the National Housing Act.[16] That section establishes a rental housing program, providing mortgage insurance and interest reduction payments on behalf of project owners who construct or rehabilitate housing "designed for occupancy by lower income families." Section 236 was amended in 1974, by the addition of a new "operating subsidy" program, the provisions of which are set forth in the margin,[17] as part of the Housing and

---

federal officers. *Winningham v. United States Department of Housing & Urban Development*, 512 F.2d 617, 620–21 (5th Cir. 1975) is not contrary. There the plaintiff sought mandamus to compel the defendants to "ignore their statutory mandate" in favor of her asserted constitutional right. Here, by contrast, the plaintiffs merely seek to enforce an alleged statutory duty, under Section 236.

14. *See Winningham v. United States Department of Housing & Urban Development*, 512 F.2d 617, 620 n.6 (5th Cir. 1975) ; *Joy v. Daniels*, 479 F.2d 1236, 1239 n.6 (4th Cir. 1973) ; *Bloodworth v. Oxford Village Townhouses, Inc.*, 377 F.Supp. 709, 714 (N.D.Ga. 1974) ; *Anderson v. Denny*, 365 F.Supp. 1254, 1259 (W.D.Va.1973).

15. The plaintiffs in *Little* also challenge the method by which HUD has calculated the operating subsidy, alleging that more residents of East Hartford Estates should be covered and that higher payments should be made. They base this claim on the special provisions for separate metering of utilities in (f)(1)(i) and (ii), and (f)(3) of Section 236. Because this claim has not been briefed or argued by either party, I do not decide it today. The plaintiffs may, of course, raise it at the hearing on the merits.

16. Now found at 12 U.S.C. § 1715z–1 (Supp. IV, 1974).

17. Section 212 of the Act recast and amended, among other provisions, subsections (f) and (g) of Section 236. The "operating subsidy"

program at issue here is contained in subsections (f)(3) and (g), and provides that:

"(3) For each project there shall be established an initial operating expense level, which shall be the sum of the cost of utilities and local property taxes payable by the project owner at the time the Secretary determines the property to be fully occupied, taking into account anticipated and customary vacancy rates. At any time subsequent to the establishment of an initial operating expense level, the Secretary is authorized to make, and contract to make, additional assistance payments to the project owner in an amount up to the amount by which the sum of the cost of utilities and local property taxes exceeds the initial operating expense level, but not to exceed the amount required to maintain the basic rentals of any units at levels not in excess of 30 per centum, or such lower per centum not less than 25 per centum as shall reflect the reduction permitted in clause (ii) of the last sentence of paragraph (1), of the income of tenants occupying such units. Any contract to make additional assistance payments may be amended periodically to provide for appropriate adjustments in the amount of the assistance payments. Additional assistance payments shall be made pursuant to this paragraph only if the Secretary finds that the increase in the cost of utilities or local property taxes, is reasonable and is comparable to cost increases affecting other rental projects in the community.

Community Development Act of that year. This program was adopted in response to problems in the administration of Section 236, due in large measure to the sharp increases in operating costs which had taken place at many Section 236 projects. The relevant portion of the Senate Report accompanying its version of the Act is also set forth in the margin.[18] The clear import of the program, as outlined in the Committee Report, was to insulate the low-income tenants from the burden of operating cost increases.

However, no assistance payments have been made under this program. Instead,

the Secretary of Housing and Urban Development, claiming that she possesses "full discretion to determine whether the program should be implemented," has decided not to fund or implement the program in any way.[19] The plaintiffs contend that this decision contravenes the mandate of Congress, and constitutes an unlawful "impoundment" of funds by the Secretary.[20] They argue, first, that she possesses no such "absolute" discretion regarding the implementation of the "operating subsidy" program and, second, that she has abused whatever discretion she may possess.

"(g) The project owner shall, as required by the Secretary, accumulate, safeguard, and periodically pay to the Secretary all rental charges collected in excess of the basic rental charges. Such excess charges shall be credited to a reserve fund to be used by the Secretary to make additional assistance payments as provided in paragraph (3) of subsection (f) of this section. During any period that the Secretary determines that the balance in the reserve fund is adequate to meet the estimated additional assistance payments, such excess charges shall be credited to the appropriation authorized by subsection (i) of this section and shall be available until the end of the next fiscal year for the purpose of making assistance payments with respect to rental housing projects receiving assistance under this section. For the purpose of this subsection and paragraph (3) of subsection (f) of this section, the initial operating expense level for any project assisted under a contract entered into prior to August 22, 1974, shall be established by the Secretary not later than 180 days after August 22, 1974."

18. "The Committee was concerned with the problem experienced by projects where costs rise above those initially projected. Under the present program, there is no way of adjusting the subsidy to meet such costs, with the result that the burden falls upon lower income tenants, who may thus be required to pay far more than 25 percent of their incomes for their apartments. While anxious to deal with this problem, however, the Committee also of course desired to develop a provision which would focus upon the real problem cases and could be tightly administered and would not simply reward poor management.

"Accordingly, the bill provides that for each project there would be established an initial operating expense level equal to the

sum of the cost of utilities, maintenance,* and local property taxes, taking into account anticipated and customary vacancy rates. On the basis of this initial level, the Secretary would be authorized to provide additional assistance payments in problem cases where needed to offset increases in the costs covered. These additional payments could not exceed the lesser of (A), the amount by which the sum of the cost of utilities, maintenance, and local property taxes exceeds the initial operating expense level, or (B) the amount required to insure that the basic rent of any unit does not exceed 30 percent of the income of the tenant occupying such unit. Additional operating assistance payments could only be made where the increase in the cost item involved is reasonable and comparable to cost increases affecting other rental projects in the community."
S.Rep. No. 693, 93d Cong., 2d Sess. (1974), reported at 3 U.S.Code Cong. & Admin.News, pp. 4303–04 (1974).

* The provision for subsidizing increases attributable to maintenance was deleted from the bill before its enactment into law.

19. The Secretary has the authority, under subsection (h) of Section 236, "to make such rules and regulations, to enter into such agreements, and to adopt such procedures as are deemed necessary or desirable to implement the Section 236 program. None of this authority has been exercised with respect to the operating subsidy" provisions.

20. Neither they nor the Secretary contend that the provisions of the Congressional Budget and Impoundment Control Act of 1974, Pub.L. 93–344, 88 Stat. 297, 31 U.S.C. § 1401 et seq. (Supp. IV, 1974) apply to this case. The President has not included the moneys in the reserve fund established by subsection (g) among the deferrals of budget

The issues in this case are quite similar to those addressed by the Court of Appeals for the District of Columbia Circuit in *Commonwealth of Pennsylvania v. Lynn.*[21] Here, as there, the Secretary's claim of discretion not to implement the Section 236 program does not rest on a claim of executive power not to spend appropriated funds or use released contract authority for fiscal or other policy reasons "totally collateral" to the purpose of the Section 236 housing program.[22] Rather, the Secretary has refused to act on the basis of policy decisions she claims will better effectuate the underlying goals of the National Housing Act and, indeed, Section 236 itself. In *Lynn* the court held that the Secretary possessed a narrow discretion to terminate or suspend the entire Section 236 program,[23] and that the temporary suspension there at issue constituted a reasonable exercise of that discretion.[24] Here the question concerns the Secretary's decision not to implement certain newly enacted subsidy provisions of that same Section 236 pro-

gram. At issue is the extent of her discretion, and the propriety of its exercise.

### III.

■ I turn first to the question of whether the Secretary possessed any discretion not to implement the "operating subsidy" program. The answer must be found by probing the intent of Congress in enacting the program.[25] The Secretary cites the language of the Act, its legislative history, and the subsequent funding actions of the Congress in support of her claim that the Congress never intended to compel her to implement this program. Her initial argument is that all three of these are couched in precatory rather than mandatory language; from this she concludes that the "operating subsidy" program was but one of several options open to her for use in implementing the overall objectives of the National Housing Act. Her second argument, based exclusively on the provisions for funding the program, is that she possesses discretion concern-

---

authority required to be reported to Congress by that Act. Nor has the Comptroller-General. The Congressional debates are unclear as to whether the Secretary's contract authority which was released prior to the passage of the Impoundment Control Act is governed by its provisions. The Senate sponsor, Senator Sparkman, stated his belief that the funds already impounded would be subject to that Act, in response to a question from Senator Humphrey. 120 Cong.Rec. S14,896 (daily ed. Aug. 13, 1974). In the House of Representatives, however, Representative Brown of Michigan indicated that it was his understanding that that Act would not apply to previously appropriated funds. 120 Cong.Rec. H8433 (daily ed. Aug. 15, 1974). The Senate version of the Housing and Community Development Act had contained a provision, Section 821, purporting to require the President and the Secretary to fully fund the programs under the Act. This provision was deleted from the Housing and Community Development Act prior to its adoption, perhaps because of the intervening passage of the Impoundment Control Act. The Impoundment Control Act was adopted with a disclaimer provision, Section 1001 of Pub.L. 93–344. That clause stated that:

"Nothing contained in this Act . . . shall be construed as . . . (4) superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder."

Because I construe § 1715z–1(g) as requiring the Secretary to spend the moneys in the reserve fund, *see* Part III B, *infra*, at 1284–1288, this disclaimer clause indicates that the Impoundment Control Act is inapplicable here.

21. 163 U.S.App.D.C. 288, 501 F.2d 848 (1974). Two district courts have decided practically identical cases and reached the same result as do I. *Harrison v. Hills*, Civil No. 75–938 (W.D.Pa. Oct. 1, 1975) ; *Ross v. Community Services, Inc.*, 396 F.Supp. 278 (D.Md.1975).

22. *See Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848, 852 (1974) and cases cited therein.

23. 501 F.2d at 861.

24. 501 F.2d at 865, 867.

25. 501 F.2d at 852, citing *Minor v. Mechanics' Bank*, 26 U.S. (1 Pet.) 46, 64, 7 L.Ed. 47 (1828).

ing how to allocate the contract authority Congress has released to her among the various federal housing programs for which that authority may be used, and hence is empowered to choose not to expend that authority on any particular program.

## A. *The Language*

The Secretary begins her mandatory/precatory distinction by contrasting the language in two subsections of Section 236, (f)(2) and (3). The first of these established the "deep subsidy" program, and provides that "the Secretary shall make, and contract to make, additional assistance payments . . .." This program has been implemented by the Secretary.[26] The "operating subsidy" program at issue in this case was established by (f)(3), which provides that "the Secretary is authorized to make, and contract to make, additional assistance payments . . .." Both subsidies were added by the 1974 amendments to Section 236.[27] Focusing upon the use of "authorized" in (f)(3), the Secretary claims that Congress never intended to *compel* her to "make, and contract to make" the payments permitted by that subsection.

She makes essentially the same argument based on the legislative history of the Housing and Community Development Act of 1974, emphasizing the phrases "would be authorized" and "may be used" in the Report of the Senate Banking, Housing, and Urban Affairs Committee.[28] Her claim is also based on the language of the Senate Appropriations Committee's Report [29] accompanying the Supplemental Appropriations Act [30] which specifically "authorizes" the Secretary to use her available contract authority to implement the "operating subsidy" program.

The Secretary's emphasis on "may" and "authorized" is misplaced. Despite the deference properly due to the interpretation given the statute by the agency charged with its enforcement,[31] I conclude that the overall thrust of this statute is not optional. In addition to those passages relied upon by the Secretary, subsection (f)(3) directs that "[f]or each project there shall be established an initial operating expense level" when the project is fully occupied. Furthermore, subsection (g) requires the establishment of that level, for Section 236 projects already under contract, "not later than 180 days after August 22, 1974," the date of enactment of the Act.[32]

---

26. Brief of Defendant Carla Hills at 10.

27. Section 212 of Pub.L. 93–383, 88 Stat. 633 (1974).

28. S.Rep. No. 693, 93d Cong., 2d Sess. (1974).

29. S.Rep. No. 1255, 93d Cong., 2d Sess. 8 (1974).

30. Pub.L. 93–554, 88 Stat. 1771 (1974).

31. *See, e. g., Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

32. The Secretary's predecessor apparently interpreted the virtually identical language of 42 U.S.C. § 1437g as being mandatory. That section directs that:

"the Secretary shall establish standards for costs of operation and reasonable projections of income, taking into account the character and location of the project and characteristics of the families served, or the costs of providing comparable services as determined in accordance with criteria or a

formula representing the operations of a prototype well-managed project."

These operating cost levels are to be established so that the Secretary:

"may make annual contributions to public housing agencies for the operation of low-income housing projects."

These provisions were enacted as the new "Section 9" program, by Section 201(a) of the same Housing and Community Development Act of 1974 which established the Section 236 "operating subsidy" program at issue in this case.

The language establishing these two programs is quite similar, both authorizing the Secretary to pay operating cost subsidies to projects serving low-income tenants and mandating the setting of operating cost levels. However, HUD has treated the two programs quite differently, acting rapidly to implement the Section 9 program while leaving the Section 236 program dormant. An Interim Rule was published in the Federal Register of April 16, 1975, implementing the Section 9 program

Subsection (g) also directs that the project owner "shall" pay excess rentals to the Secretary, which "shall" be credited to a reserve fund, for use in implementing the "operating subsidy" program established by (f)(3). Such excess rental charges "shall" be treated as appropriated funds, available to make these additional assistance payments, during any period that the Secretary has determined them sufficient to implement the program.

Of course, "tallying the 'shalls' and 'mays'" does not always provide insight into Congress' collective state of mind.[33] This is particularly true where, as here, the statute is a mixture of mandatory and precatory clauses. The Secretary asserts that she is not even required to make a determination of the initial operating expense levels, despite the statute's apparently mandatory language and explicit compliance deadline. The Secretary is wrong about that. The mandatory language of this clause, the inclusion of the compliance deadline for existing projects, and the adoption of the program in response to a specific need, convince me that Congress intended that the Secretary implement this program, and do so quickly. I interpret the "authorization" language as indicating only that the Secretary need not make, or contract to make, these additional assistance payments in any set amounts, or for every single Section 236

project.[34] Congress was concerned about this problem, but wanted to handle it without rewarding those projects where poor management was responsible for the cost increases.[35] Accordingly, it adopted a program which permitted the Secretary to assist deserving projects only; hence the use of "authorized" rather than "shall" in the statute. Under this reading of Section 1715z–1, the Secretary was mandated to establish "an initial operating expense level" for the three projects involved in this suit. The temporary restraining orders issued in these cases directed that she do so immediately, and those levels have now been established.[36]

### B. *The Funding Arrangements*

The Secretary also contends that, even if she must take the first steps toward implementing the "operating subsidy" program, the funding actions of Congress demonstrate that she has discretion over whether or not to fund the program. Of course, this is simply another way of claiming that she has complete discretion concerning whether to implement the program at all. Her argument rests upon the general nature of her spending authority under the federal housing programs, the specific provisions of this statute, and the actions of the Congress subsequent to the passage of the Housing and Community Development Act of 1974.

for operating cost subsidies to public housing agencies retroactively to April 1, 1975. 24 C.F.R. §§ 890.101 *et seq.*, 40 Fed.Reg. 17008–15 (1975). Yet nothing has been done to implement the Section 236 program for similar subsidies to housing projects assisted under Section 236 except pursuant to court orders. And this inaction has occurred despite Congress' setting an explicit compliance deadline of 180 days for the Section 236 program, while permitting 18 months for the implementation of the Section 9 program. *Compare* Section 201(b) of Pub.L. 93–383 *with* subsection (g) of Section 236, establishing the effective date of the Act.

33. *Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848, 854 (1974).

34. The *"Joint Explanatory Statement of the Committee of Conference"* on Pub.L. 93–383, Conf.Rep. No. 1279, 93d Cong., 2d Sess. (1974), states that:
   "The conferees wish to point out that the specific amount of such increased subsidies should be determined by the Secretary taking into account the need to encourage reasonable economies in the operation of projects."

35. *See* S.Rep. No. 693, quoted at note 18 *supra.*

36. HUD determined these levels, and has been paying the subsidy calculated on that basis on behalf of tenants at all three projects, as set forth in note 9 *supra.* As discussed in note 15 *supra,* the plaintiffs in *Little* challenge the calculations used.

The federal housing programs are funded through a combination of Congressional actions. First, Congress must authorize the appropriation of funds for a program; this is done by subsection (i) of Section 236,[37] which provides:

"There are authorized to be appropriated such sums as may be necessary to carry out the provisions of this section . . .."

Subsection (i) further provides that:

"The aggregate amount of outstanding contracts to make such payments shall not exceed amounts approved in appropriation Acts, and payments pursuant to such contracts shall not exceed . . .."

This demonstrates the other steps in the normal funding process: Congress must release contract authority to the Secretary, and it must also appropriate funds to make payments under these contracts. These latter two steps must be done in Appropriations Acts, separate and distinct from the authorizing statute. The Secretary notes that Congress has not released any new contract authority for use in implementing the "operating subsidy" program, nor has it appropriated funds specifically for that purpose. Thus, she claims, the implementation of the program must come out of funds and contract authority generally available for use in the Section 236 program, funds over which she claims to have broad discretionary power.

Her argument runs as follows. First, she contends that the original Act does not compel her to spend the moneys in the reserve fund, since the Legislative history merely provides that they "may be used" to make these additional assistance payments. Second, she argues that she has no power to expend these moneys except pursuant to contract, because payments are to be made as provided in (f)(3). Thus, she cannot implement the program unless she has contract authority available. Since no new contract authority has been released, she has to use contract authority which she had prior to the establishment of the "operating subsidy" program. She admits that the legislative history to the Supplemental Appropriations Act [38] clarified Congress' intent with respect to funding the "operating subsidy" program, specifically authorizing the Secretary to use her "available contract authority for operating subsidies for existing or new 236 projects." [39] However, she again raises the mandatory/precatory argument, since the committee report merely "authorizes" her to so use that authority. Furthermore, she contends that this language must be considered in conjunction with the Congress' explicit direction in that same report that the Secretary "utilize available resources for the Section 236 program at the earliest date to meet the need for lower income housing." [40] This second directive, she asserts, meant that she was to use her available contract authority to increase housing production,[41] and that, when read together, these two directives give her discretion over how to allocate her contract authority among a number of

37. 12 U.S.C. § 1715z–1(i) (Supp. IV, 1974).

38. Pub.L. 93–554, 88 Stat. 1771 (1974).

39. S.Rep. No. 1255, 93d Cong., 2d Sess. 8 (1974).

40. *Id.*

41. The interest reduction payment and mortgage guarantee programs are commonly known as the "production subsidy," since they were enacted to encourage the construction and rehabilitation of low income housing. The Secretary contrasts the impact of these programs with the "operating subsidy" at issue in this case, which she claims will not encourage the bringing of new units into the market. Although I need not resolve the conflict she asserts exists between these two instructions, *see infra* at 1288, I note that the Senate appeared to believe the "operating subsidy" to be relevant to housing production when it urged the Secretary to consider her authority to pay it in her evaluations of proposed Section 236 projects. S.Rep. No. 1255, 93d Cong., 2d Sess. 8 (1974). I also note that the "operating subsidy" program may help "meet the need for lower income housing" to which the Senate and the Secretary referred, by keeping Section 236 projects out of default and by keeping their basic rentals down for their low income tenants.

federal housing subsidy programs in order to best respond to the need for lower income housing.

There are two responses to this argument. The first involves the relationship between the reserve fund and the exercise of contract authority. The second involves the scope and exercise of the Secretary's discretion with respect to the use of her admittedly available contract authority. Only the first is properly considered at this time, since it involves the mandatory nature of the "operating subsidy" program. The second concerns the exercise of the Secretary's discretion, and will be considered in Part IV of this opinion.

The problem with the Secretary's arguments concerning the availability of the reserve fund is her initial premise. Were she authorized to "make" these additional assistance payments without a "contract to make" them, the program could operate independently of her available contract authority. I hold that she is so authorized.

The statute authorizes her to *"make, and contract to make,"* (emphasis added) these payments. It also provides a source of funds from which she is to "make" these payments—the reserve fund discussed in subsection (g). That subsection directs that excess rental charges be paid to the Secretary, and credited to the reserve fund. These moneys are "to be used by the Secretary" to make the additional assistance payments. Whenever she "determines that the balance in the reserve fund is adequate," she is to credit the excess charges to the appropriation authorized in subsection (i). These moneys "shall be available" until the end of Fiscal Year 1976, for implementing the "operating subsidy" program. As provided in subsection (f)(3), the payments may only be made after the Secretary determines that the operating cost increases sought to be subsidized are "reasonable" and "comparable" to those occurring throughout that community.

Congress thus established, in subsection (g), a special method for funding the "operating subsidy" program, under which the excess rental payments would automatically be ploughed back into the Section 236 program. When the Section 236 program was first established,[42] the reserve fund was to be used to make interest reduction payments, "subject to limits approved in appropriation Acts pursuant to subsection (i)" of 12 U.S.C. 1715z–1.[43] The Housing and Community Development Act of 1974 changed both the purpose for which, and means by which, the reserve fund was to be spent. It directed that the fund henceforth go to the "operating subsidy" program, rather than for interest reduction payments, the Senate Report noting that the Committee considered this a "more appropriate" use of the fund.[44] Furthermore, as noted above, the fund would now be appropriated automatically, and hence available for distribution, once the Secretary determined its balance to be sufficient to implement the "operating subsidy" program. This new

---

42. In 1968, by the Housing and Urban Development Act of that year, Pub.L. 90–448, 82 Stat. 498 (1968).

43. This was the original language of 12 U.S.C. § 1715z–1(g), as enacted in 1968.

44. S.Rep. No. 693, 93d Cong., 2d Sess. (1974). This portion of the report states:

"Under the current law, where tenants in a project are able to pay more than the basic rent the excess is returned to the Federal Government and may be used for the production subsidy now authorized. The Committee feels that it would be more appropriate if the 'excess' funds derived from project operations were made available for the making of the additional assistance payments to offset operating costs. Accordingly, the bill provides that such excess rentals shall be credited to a fund which may be used by the Secretary for making the additional payments based on initial operating expense ratios, as described above. This provision would also be applied to projects in the current section 236 program. For these existing projects, it is expected that the Secretary would establish the 'initial' ratios as of a date not later than 180 days after enactment of the bill."

procedure meant that Congress would not have to approve appropriations to the fund, provided the amounts involved remained within the authorization ceiling set forth in subsection (i). In this respect this funding method is similar to the contract-authority and allotment scheme considered in *Train v. City of New York*.[45] Under this view of the statute, direct payments can be made out of the reserve fund, not pursuant to any contract and, hence, without reducing the Secretary's available contract authority.[46] Of course, the Secretary may choose to fund the program by using her available contract authority, as is also provided in subsection (f)(3). Congress explicitly authorized this alternative funding method later in 1974.[47]

The issue here thus becomes, as it was in *Train v. City of New York*,[48] whether the Secretary has the authority not to spend the reserve fund to implement the "operating subsidy" program. All the language concerning the reserve fund is mandatory, except that making the Secretary responsible for determining whether the balance is adequate to fund the program. Furthermore, the Act contains a strict compliance deadline, directing the Secretary to establish initial operating expense levels for existing Section 236 projects within 180 days.

The Secretary argues, however, that the legislative history supports her contention that the reserve fund need not be so used. She once again points to the phrase "may be used" in the Senate Report discussing the new program and the attendant changes in the use of the reserve fund.[49] However, here the language of the statute is clearly mandatory, and the presence of a possibly qualifying phrase in the legislative history cannot undercut that interpretation.[50]

More important, the legislative history does not support the Secretary's position. The Senate Committee's phrase "may be used" must not be isolated from its legislative context. The Congressional hearings [51] which led up to the Housing and Community Development Act of 1974 demonstrated that rising operating costs were endangering the viability of many Section 236 housing projects.

**45.** 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975). *See* particularly the discussion at 420 U.S. 38, n.2, 95 S.Ct. 839.

**46.** Reference to the operating subsidy program adopted in 1974 for public housing agencies, discussed in note 32 *supra*, may prove helpful here as well. 42 U.S.C. § 1437g provides that:

"The Secretary shall embody the provisions for such annual contributions in a contract guaranteeing their payment subject to the availability of funds."

Congress there required that the payment of operating cost subsidies be made pursuant to a contract. Its failure to include a similar *requirement* in subsections (f)(3) and (g) lends further support to my interpretation of the funding method it set up here.

**47.** In the Supplemental Appropriations Act, Pub.L. 93–554, 88 Stat. 1771 (1974).

**48.** 420 U.S. 35, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975).

**49.** S.Rep. No. 693, 93d Cong., 2d Sess. (1974).

**50.** Subsection (g) is set forth in full at note 15 *supra*. *See generally Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962). *See also Train v. City of New York*, 420 U.S. 35, 44–46, 95 S.Ct. 839, 43 L.Ed.2d 1 (1975).

**51.** *See generally* "Hearings on Oversight on Housing and Urban Development Programs, Washington, D. C." Before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess., pts. 1 and 2 (1973). As Phillip N. Brownstein, Esq., a former HUD Assistant Secretary, testified on April 16, 1973:

"A continuing problem in the 236 program has been the under estimation of operating costs. Projects have been approved with unreasonably low cost figures and later as costs begin to mount rents have to be increased to levels that make the units too expensive for the income group contemplated." *Id.*, pt. 1, at 408.

Also helpful are the "Oversight Hearings" held at Chicago, Illinois earlier in 1973 and the Hearings on the Administration's 1973 Housing Proposals Before the Senate Committee on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess. (1973). These latter hearings covered S.2490, S.2507, and S.2508.

These increased costs were passed on to the tenants, many of whom were forced to choose between spending far in excess of one-quarter of their incomes on shelter or leaving the housing project.. And, as the Court of Appeals noted in *Commonwealth of Pennsylvania v. Lynn*, the project owners had a "strong interest" in attracting tenants with large incomes, rather than low-income tenants for whom the program was designed,[52] since:

> "all tenants must pay at least the 'basic rent,' *i. e.*, their share of operating expenses plus amortization at an assumed one per cent, by themselves, tenants with a larger income are better able to absorb increases in the basic rent, which increases as operating expenses rise."

501 F.2d at 865–66. Thus, as enacted, the "operating subsidy" program was designed to insulate the tenants from these cost increases, to protect the project owners from vacancies and collection losses, and to preserve the low-income character of the Section 236 housing projects.[53] My review of this legislative history merely strengthens my conclusion that the Congress did not give the Secretary any discretion—full and absolute or otherwise—not to use the reserve fund to implement the "operating subsidy" program. The statute is mandatory, and the Secretary's refusal to implement the program is contrary to law.

## IV.

If, however, the Secretary is correct in her contention that payments from the reserve fund can only be made pursuant to contracts, then those disbursements are subject to the Secretary's allocation of her contract authority. Accordingly, I turn now to her claim that she possesses discretion concerning the allocation of her contract authority, and that she has properly exercised it in deciding not to fund the "operating subsidy" program.

■ I do not disagree with her basic contention, that she has discretion over how to allocate her contract authority among the various federal programs providing assistance to housing for which it might be used. Congress centainly vested her with this discretion by releasing such contract authority to her without specifying what programs were to be funded, or at what levels. Thus, it is unimportant whether or not there is a real conflict, as she claims, between her authority to implement the "operating subsidy" program and Congress' directive that she act to "meet the need for lower income housing."[54] The discretion to choose how to reconcile those objectives is necessarily vested in her office.

My task, therefore, is to evaluate how she has exercised this discretion. The decision not to fund, or implement in

---

52. HUD now favors lifting income ceilings for Section 236 projects, as its "solution" to the sharp increases in operating costs. *See* 24 C.F.R. 236.72, 40 Fed.Reg. 52844–45 (1975).

53. *See* S.Rep. No. 693, 93d Cong., 2d Sess. (1974) reported at 3 U.S.Code Cong. & Admin.News 4302 (1974). The Report provides:

> "Section 502 of the bill authorizes a new program of rent subsidies for lower income families.

> "This program appears as section 502 of the proposed Act and grows out of the existing rental housing housing assistance program (section 236 of the National Housing Act). However, while it retains features

of existing law, it also contains numerous improvements in that law so as to be, in many ways, a new program rather than a simple continuation of the old. It is believed that these changes—including provisions to promote a mix of families with more widely varying income levels and to prevent excessive rent increases and assist sponsors in meeting increases in operating costs beyond their control—will help eliminate a variety of problems and permit the program to operate more effectively in the future. . . ."

Section 502 of the bill became Section 212 of the Housing and Community Development Act of 1974.

54. *See* note 41 *supra*.

any fashion, the "operating subsidy" program is analogous to the decision by one of her predecessors to suspend the Sections 235, 236, and 101 programs.[55] Here, as there, the discretion not to implement a Congressionally authorized and funded program is, at best, quite narrow.[56] Accordingly, I shall test her actions by the reasonableness standard applied in *Commonwealth of Pennsylvania v. Lynn*.[57] The question becomes whether it was reasonable for the Secretary not to implement the "operating subsidy" program, considering (as she claims to have done) the purposes and policies behind Congress' enactment of that program, the objectives of Section 236 and the National Housing Act, and the expected consequences of her decision.

■ My pursuit of this inquiry is assisted greatly by the Congressional response to the earlier decision to suspend (or terminate) the Sections 235 and 236 programs. The Senate Reports [58] which accompanied the 1974 HUD Appropriations Act [59] stated that the Appropriations Committee

"is distressed and deeply concerned by the Administration's action to abandon our nation's historic housing program. . . . In January 1973 the Administration froze virtually all new starts for low and moderate income families. Some 17 housing programs or programs closely associated with housing were stopped. . . . The Committee feels that the Administration has justified its actions for a variety of unsupported reasons. Among other things, it has claimed that the programs were not achieving the goals

set by Congress, but by no stretch of the imagination is that correct." [60]

That same Committee responded equally strongly to the decision in *Commonwealth of Pennsylvania v. Lynn* which upheld the legality of the suspensions discussed in the preceding paragraph. The Court in *Commonwealth of Pennsylvania v. Lynn* found as a fact that there were inherent structural problems with the Section 235 program, problems sufficient to justify the then-HUD Secretary's decision to suspend that program.[61] The Court also found it "sufficiently plausible" that similar defects were inherent in the Section 236 program, and therefore it upheld the Secretary's conclusion that it was also impossible to administer that program consistently with Congressional intent.[62] However, the Congress apparently disagreed with these conclusions, for it extended the life of the Sections 235 and 236 programs for two years, until the end of Fiscal Year 1976, when it adopted the Housing and Community Development Act of 1974.[63] Indeed, the Senate Report which accompanied the subsequent HUD Appropriations Act took issue with "some judicial mistakes of fact," stating explicitly that:

"The Sections 235 and 236 programs suffered from both HUD mismanagement, and actual corruption, rather than from any inherent defects in the programs. In cities with good HUD management, such as Milwaukee, the program was a great success. In cities with rampant corruption among housing officials, it, along with other HUD programs, failed. But the failures in certain cities were not pe-

---

55. Secretary Romney suspended these programs on January 8, 1973.

56. *Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848, 862 (1974).

57. *Id.*

58. S.Rep. No. 1056, 93d Cong., 2d Sess. (1974) and S.Rep. No. 1091, 93d Cong., 2d Sess. (1974).

59. Pub.L. 93–414, 88 Stat. 1095 (1974).

60. S.Rep. No. 1091, 93d Cong., 2d Sess. 6 (1974).

61. *Commonwealth of Pennsylvania v. Lynn*, 163 U.S.App.D.C. 288, 501 F.2d 848, 865 (1974).

62. 501 F.2d at 867.

63. Pub.L. 93–383, 88 Stat. 633.

culiar to Sections 235 and 236 and, in fact, these programs were not the main ones affected or which failed, contrary to the opinion of the Department and some judicial mistakes of fact. The Department blamed the programs instead of its own mismanagement. As a consequence of this mismanagement, over 400 indictments have been handed down in housing fraud cases.

. . . More than two-thirds of those receiving assistance receive lower subsidies each year because their incomes are rising, which was a major aim of the program. Some 50,000 Section 235 homebuyers have gone off subsidy altogether and, in the Committee's opinion, these are distinct measures of program success." [64]

I consider myself bound by these expressions of Congress' confidence in these programs. The wisdom or effectiveness of the entire Section 236 program is not in issue in this case, but these statements by the Committee are relevant to an evaluation of the Secretary's decision not to implement the "operating subsidy" provisions of the Section 236 program.

The Secretary refuses to implement the "operating subsidy" program because she claims it is "inequitable." She points to what HUD perceives as a

"Need for a general multifamily default policy which will address itself to the economic difficulties facing owners and tenants of all HUD assisted multifamily projects." [65]

She then contrasts this need with the limitations in the groups served and relief afforded by the "operating subsidy" program, and concludes that the public interest is better served by not funding such a limited and discriminatory program.

The Congress, however, has specifically indicated its disagreement with precisely this sort of "all or nothing" analysis. The same Senate Report quoted above rejected a similar HUD argument in favor of the suspension decision, "that if not everyone could be subsidized under the program, no one should be subsidized." [66] The Committee urged the Secretary to implement the programs "concurrently" with the new Section 236 program, characterizing the "all or nothing" decision to halt the older programs as one based on "policy distaste," not "factual evidence." In response to that policy decision, as noted above, the Congress extended the life of the Sections 235 and 236 programs.

The same considerations apply to the "operating subsidy" program at issue here. It was added to Section 236 in 1974, for projects assisted under Section 236, as part of Congress' effort to improve the Section 236 program when it was reenacted. Congress adopted the "operating subsidy" provisions in response to the serious problem of operating cost increases due to sharp rises in oil prices and local property taxes.[67] The program was designed to assist only "deserving" projects, and their low income residents. HUD cannot now refuse to fund or implement the "operating subsidy" provisions because they only solve the particular problem for which they were designed, or because they only help the particular population for which they were enacted. The "operating subsidy" program does not have a counter-productive impact on our national housing effort merely because it does not solve all the present problems facing HUD's multifamily assistance programs. Surely Congress has the

---

64. S.Rep. No. 1091, 93d Cong., 2d Sess. 6–7 (1974).

65. Affidavit of H. R. Crawford, Assistant Secretary for Housing Management of the Department of Housing and Urban Development, at 2 (October 15, 1975).

66. S.Rep. No. 1091, 93d Cong., 2d Sess. 7 (1974).

67. 120 Cong.Rec. S14896 (daily ed. Aug. 13, 1974), remarks of Senator Humphrey.

power to solve a specific problem with which it is familiar without running the risk of administrative nonenforcement because it has not gone far enough, or not gone in the direction considered desirable by the executive branch. I find that Congress enacted the "operating subsidy" program in an effort to help those well-managed Section 236 housing projects which had been the victims of skyrocketing tax and utility bills, and the low income tenants residing in those projects.

The legislative history of the funding process strengthens my conclusion that the Congress intended that this program be implemented, using the Secretary's available contract authority if necessary. As the Secretary notes in her brief, Congress initially forbade her from using her then-available contract authority to implement the "operating subsidy" program.[68] However later that year, in a "clarification" of the earlier Conference Report, the Secretary was specifically "authorized" to use her available contract authority to implement the program.[69] Furthermore, she was directed to consider this authority in evaluating the feasibility of proposed Section 236 projects.[70] Of course, Congress could have spoken more bluntly. It

might have mandated that the Secretary use her contract authority, and use it to fund the "operating subsidy" program. Indeed, the Secretary now argues that Congress' failure to do just that, in the face of her adamant refusal to fund the program, constitutes acquiescence with her decision. But Congress cannot be required to legislate two or three or more times before the executive must act. Where it has once spoken clearly, the duty to execute the law arises.[71]

I conclude that Congress has spoken clearly here. It extended the life of the Section 236 program, in spite of executive branch criticism and opposition.[72] It rejected that criticism, which alleged that the program was unworkable and could not help everyone. It amended the program, to solve some of what it saw as the real problems which had developed. It set up a special funding method for the "operating subsidy" provisions of the program. It specifically permitted the use of contract authority as an alternate way to fund the new "operating subsidy" provisions. The Secretary's claimed rationale for refusing to fund the program with her contract authority—its inequitable coverage —misses the point of Congress' actions entirely and does not constitute a valid

---

68. Conf.Rep. H.R. No. 1310, 93d Cong., 2d Sess. 6 (1974). The report's pertinent provision reads:
    "The conferees are also agreed that the provisions relating to operating costs subsidies in the new section 236 program authorized by the Housing and Community Development Act of 1974 shall not apply to the unused balance of outstanding contract authority that may be committed for new projects pursuant to this act."

69. S.Rep. No. 1255, 93d Cong., 2d Sess. 8 (1974). This report reads:
    "The Committee wishes to clarify the intent of the joint explanatory statement of the Committee of Conference on H.R. 15572 with respect to the use of operating cost subsidies for Section 236 projects that the Secretary is authorized to use available contract authority for operating subsidies for existing or new 236 projects."
    This change was agreed to by the Conference Committee:

"The conferees are agreed as to the clarifying intent of the language in the Senate Report relating to the utilization of operating subsidies for section 236 projects." Conf.Rep. H.R. No. 1503, 93d Cong., 2d Sess. 5 (1974).

70. S.Rep. No. 1255, 93d Cong., 2d Sess. 8 (1974). This section of the report reads:
    "In evaluating the feasibility of any new project which is proposed to be assisted under the Section 236 program, the Secretary should take into account his authority to use operating cost subsidies in case there is an increase in utility costs and local property taxes."

71. *Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848, 861 (1974).

72. *See* S.Rep. No. 1091, 93d Cong., 2d Sess. (1974).

exercise of discretion. Thus, her decision not to implement the program in the face of these strong manifestations of Congressional sentiment is unreasonable. I hold that even if the use of contract authority were necessary to use the moneys in the reserve fund to implement the "operating subsidy" program, her refusal to do so in these cases constitutes an unreasonable exercise of her discretion.

## V.

■ The standards governing the issuance of preliminary injunctive relief are well-established in this circuit. The party seeking the injunction must combine a clear showing of probable success on the merits with the possibility of irreparable injury, or else raise substantial questions involving the merits, while demonstrating that the balance of hardships tips sharply in his/her favor.[73]

■ As the foregoing discussion demonstrates, I am of the opinion that the plaintiffs will almost surely succeed in obtaining permanent injunctive relief at the trial on the merits. The nature of the relief they seek, federal subsidies enabling them to continue in low-cost housing, and the nature of the harm they face if such relief is denied [74] persuade me that they will suffer irreparable injury if the Secretary is not ordered to continue payment of the "operating subsidy" pending my final ruling. HUD is not paying the full amount of any of these rent increases, but only that portion attributable to increases in local property taxes and utilities. In all three cases, however, this is a substantial portion of the total increase. In *Walter* it comprises 98% of the increase, in *Little* 23%,[75] and in *Dubose* nearly 100%. This constitutes a sufficient showing of irreparable injury to warrant the issuance of preliminary injunctive relief.[76]

## VI.

I have concluded that the plaintiffs are entitled to the preliminary injunctive relief they seek. Pursuant to my earlier orders, the operating levels for these three projects have already been determined. All that remains to set the program in motion is a determination by the Secretary that the balance in the fund is adequate to implement the "operating subsidy" program. The affidavits which have been submitted by the Secretary indicate that there is enough money in the reserve fund to finance the program for the remainder of this fiscal year. As of October 31, 1975 the balance in the fund was $40,647,789.[77] The

73. *Checker Motors Corp. v. Chrysler Corp.*, 405 F.2d 319, 323 (2d Cir. 1969).

74. Plaintiff Dubose alleges that, unless the rent increase were rescinded, her rent would constitute 61% of her income, and 78% of her "adjusted monthly income" as calculated according to the HUD Handbook, 4510.1 paragraph 10–7, page 10–6. The same figures apply to the other named plaintiff in *Dubose*, Ms. Daigle. The named plaintiffs in *Walter*, Ms. Walter and Mr. Cortese, would be required to pay 73% and 35.9% of their respective incomes, or 92% and 39.9%, again respectively, of their HUD-calculated "adjusted monthly incomes." Ms. Little, named plaintiff in the third lawsuit here, alleges that 41% of her income and 52% of her "adjusted monthly income" will have to go for rent.

75. The dispute in *Little* concerning the applicability and effect of the provisions for separate utility metering, *see* note 15 *supra*, explains why this amount is so much lower.

As of this time the tenants at East Hartford Estates are paying their own electric bills, with the result that increases in electricity costs were not included in the proposed rent increase.

76. *ITT v. Vencap, Ltd.*, 519 F.2d 1001, 1019 n.33 (2d Cir. 1975).

77. Affidavit of H. R. Crawford, at 6, (Oct. 15, 1975), as supplemented by Letter of November 20, 1975 from Marjorie A. Wilhelm, Assistant U. S. Attorney, to this court. The plaintiffs in *Walter* contend that even this figure is too low, because of changes in the method for collecting the excess rentals promulgated by HUD in its Transmittal No. 24 of June 6, 1975, for inclusion in the Insured Project Servicing Handbook. That transmittal permits project owners to deduct their collection losses before making the required payments to the reserve fund. The plaintiffs are free to raise this issue at the trial on the merits;

Department estimates that full implementation of the "operating subsidy" program would require approximately $4.3 million per month,[78] or less than $30 million for the remainder of Fiscal Year 1976—the last year for which this use of the reserve fund is presently authorized.[79] The determination required here is merely a ministerial act, which may be ordered by me despite the Secretary's prior refusal to perform it.[80] Therefore, I order the Secretary to determine whether "the balance in the reserve fund is adequate to meet the estimated additional assistance payments" due until the end of this fiscal year.

Once that determination is made, the only apparent obstacle to continued payment of the subsidy to these three projects is the requirement that the cost increases they have suffered be found to be "reasonable" and "comparable" to those affecting similar rental projects.[81] In view of the fact that HUD has itself approved the rent increases which began this litigation,[82] based at least in part upon these figures, that requirement should not present any problem. I therefore order the Secretary to make the required finding, if proper.

Finally, once the Secretary is ready to implement the "operating subsidy" program by making these determinations, I order her to make the additional assistance payments on behalf of all tenants at these three projects who qualify according to the language set forth in 12 U.S.C. § 1715z–1(f)(3), i. e., the classes previously certified. In view of the fact that these determinations should have been made by the Secretary long ago, I order that she continue to pay the operating subsidies, as directed by the temporary restraining orders previously issued, until further order of this court.

This injunction may be modified on motion of any party, for good cause shown.

It is so ordered.

---

I need not rule on it at this time as there appear to be sufficient moneys in the reserve fund to implement the "operating subsidy" program as it stands now.

78. Affidavit of H. R. Crawford, at 6 (Oct. 15, 1975).

79. Subsection (g) of Section 236 permits the reserve fund moneys to be used to make the additional assistance payments "until the end of the next fiscal year." The Act was adopted during Fiscal Year 1975, and contains the two-year extension of the 236 program, through the end of the 1976 Fiscal Year. I construe the phrase "next fiscal year" in subsection (g), therefore, to refer to Fiscal Year 1976. I note in passing at this point that the Secretary also has available approximately $55 million of unobligated contract authority, which she could use to implement the "operating subsidy" program. Affidavit of A. J. Kliman, at 3 (Oct. 9, 1975).

80. *Miguel v. McCarl*, 291 U.S. 442, 54 S.Ct. 465, 78 L.Ed. 901 (1934).

81. 12 U.S.C. § 1715z–1(f)(3) (Supp. IV, 1974).

82. Brief of Defendant Carla Hills, at 7. HUD also approved the $10 per unit rent increase challenged in *Walter*, Brief of Plaintiff, at 10, and the $9.36 per unit rent increase challenged in *Little*, Brief of Plaintiff, at 4.