Hilda **ABRAMS** et al.,
Plaintiffs-Appellees,

v.

Carla A. **HILLS**, as Secretary of the United States Department of Housing and Urban Development, et al., Defendants-Appellants.

No. 76–2095.

United States Court of Appeals,
Ninth Circuit.

Dec. 1, 1976.

---

Robert S. Greenspan, Atty. (argued), Dept. of Justice, Washington, D. C., for defendants-appellants.

Catherine M. Bishop (argued), of National Housing and Economic Development Law Project, Berkeley, Cal., for plaintiffs-appellees.

Before BARNES, ELY and WRIGHT, Circuit Judges.

ELY, Circuit Judge:

This suit was instituted by residents of a multi-family housing project, Meyler Park, constructed with assistance provided under the National Housing Act, 12 U.S.C. § 1715z–1 (1970) (Supp. IV). The provision of that Act at issue in the present appeal established the "operating subsidy" program, a program that we shall explain. The Secretary of Housing and Urban Development (hereinafter the Secretary) refused to implement the "operating subsidy" program on various grounds, and in September, 1975, the plaintiffs, here the appellees, sued,[1] alleging that the failure of the Secretary to establish an initial operating expense level[2] for Meyler Park and to pay an "operating subsidy" was unlawful.

1. Although Meyler Park Apartments was named as a defendant in the District Court, the enterprise is not a party to this appeal.

2. The initial operating expense level is defined in 12 U.S.C. § 1715z–1(f)(3) (1970) (Supp. IV) as:

The District Court held that it had jurisdiction under 28 U.S.C. § 1361, and certified the suit as a class action on behalf of the named plaintiffs and all tenants of Meyler Park who paid "basic rent," as defined in 12 U.S.C. § 1715z–1, in excess of 25 percent of their adjusted family income. The court then held that the Secretary was required to provide an "operating subsidy" to Meyler Park and ordered the Secretary to: (a) establish an initial operating expense level for Meyler Park; (b) to pay a subsidy to Meyler Park, retroactive to February 18, 1975, equivalent to the difference between the initial operating expense level and the cost of present reasonable and comparable property taxes and utilities.

The Secretary appeals, contending that the court erred in requiring her to establish an initial operating expense level and to pay an operating subsidy to Meyler Park and that, in any event, the court erred in requiring that such payments be made retroactive to February 18, 1975.

## STATUTORY BACKGROUND

The national housing goal, as expressed in the Housing Act of 1949 is "the realization as soon as feasible of . . . a decent home and suitable living environment for every American family." 42 U.S.C. § 1441 (1949). That act provides that the agency of Housing and Urban Development ("HUD") "shall exercise [its] powers, functions and duties under this or any other law, consistently with the national housing policy declared by this act and in such manner as will facilitate sustained progress in attaining the national housing objective hereby established. . . ." 42 U.S.C. § 1441.

In furtherance of that goal, and in realization that the national housing objectives were not being achieved, Congress, in 1968,

. . . [T]he sum of the costs of utilities and local property taxes payable by the project owner at the time the Secretary determines the property to be fully occupied, taking into account anticipated and customary vacancy rates. . . .

enacted the Section 236 federally-subsidized housing program, 12 U.S.C. § 1715z–1, which was designed "to assist families with incomes so low that they could not otherwise decently house themselves." In particular, the Section 236 program was enacted "[f]or the purpose of reducing rentals for lower income families," 12 U.S.C. § 1715z–1(a), by providing for federal mortgage insurance and interest reduction payments to project owners so that rental rates to the tenants could be lowered accordingly. By this means, Section 236 encouraged private enterprise to develop low-cost housing, and, in exchange for these benefits, project owners agreed to maintain low rentals for tenants, and to be regulated by HUD with regard to leases, rent raises, and other operational activities.

As the program was initially designed, tenants in Section 236 housing projects would pay the greater of 25 percent of their adjusted income (as defined in 24 C.F.R. § 236.2) or "basic rent" calculated on the basis of operating the project under a mortgage bearing interest at one percent per annum.[3] 12 U.S.C. § 1715z–1(f)(1)(A). But no tenant would pay more than the "fair market rent," which is computed upon the project's operating cost under the existing mortgage at the commercial interest rate. 12 U.S.C. § 1715z–1(f)(1)(B).

Consistent with this scheme, direct financial assistance[4] is provided to project owners in the form of periodic interest reduction payments, which is the sum necessary to reduce the effective interest rate to one percent per year. 12 U.S.C. § 1715z–1(c). The interest reduction subsidy payment is made directly to the mortgagee on behalf of the project owner. The benefit of the interest reduction subsidy is passed on to the tenants in reduced rents. 12 U.S.C. § 1715z–1(f).

Pursuant to the statute, the Secretary is granted broad authority to promulgate regulations,[5] 12 U.S.C. § 1715z–1(e), and to enter into such agreements as she deems necessary or desirable in order to administer the program. 12 U.S.C. § 1715z–1(h). Pursuant to this latter authority, the Secretary's agreement with the mortgagor in this case provides that no change will be made in the basic rental or fair market rental unless approved by HUD. If the owner wishes to increase the rental charge above the maximum permitted by HUD, as a result of increases in taxes or maintenance costs, it must submit a written request properly supported by substantiating evidence.

Funds for the Section 236 program are provided by means of "contract authority," a process by which the Secretary enters into a commitment for the payment of federal funds both immediately and in the future, up to a stated limit, prior to an appropriation of funds for the liquidation of such commitments.

The expenditure of funds through the use of "contract authority" involves four steps. First, the basic statute establishing the program authorizes the use of contract authority. Second, the Congress, in a separate appropriation statute, releases this contract authority by authorizing the Secretary to utilize the contract authority up to a specified amount. The Secretary then may enter into contracts to make annual payments for the Section 236 program up to the limit established in the appropriation act. Finally, Congress appropriates a specific amount from the Treasury to make payments to liquidate the contracts which the Secretary has made.

*The 1974 Amendments.* By means of Section 212 of the Housing and Community

---

**3.** Basic rents are actually established upon the application of a factor of 3.331 percent to the "replacement cost" of the project. *See Dew v. McLendon Garden Associates,* 394 F.Supp. 1223, 1229 (N.D.Ga.1975).

**4.** Project owners receive indirect benefits in the form of favorable tax status [Int.Rev.Code of 1954 §§ 1250(b)(4), 1039; *see* Real Estate and

Tax Reform: An Analysis and Evaluation of Real Estate Provisions of Tax Reform Act of 1969, 30 Mich.L.R. 1 (1970)] and other monetary incentives.

**5.** The Secretary's regulations are contained in 24 C.F.R. § 236.1, *et seq.*

Development Act of 1974, P.L. No. 93–383, 88 Stat. 672, the Congress amended the National Housing Act in several respects. One of these amendments to Section 236 established the so-called "deep subsidy" program. The amendment provided that, as to 20 percent of the dwelling units in any Section 236 project constructed pursuant to a contract entered into after the effective date of the Act, the Secretary "shall make and contract to make" additional assistance payments to the project on behalf of tenants .whose incomes are too low to enable them to afford the basic rental with 25 percent of their income. 12 U.S.C. § 1715z–1(f)(2). The Secretary has implemented this program, and has estimated that it will require $29 million in contract authority to fund the program for fiscal year 1976 and the transition quarter.[6]

At issue here is another amendment contained in Section 212 of the 1974 Act. The amendment established the "operating subsidy" program and authorized the Secretary "to make and to contract to make" assistance payments to a Section 236 project owner, in addition to the interest-reduction payment, in an amount up to the amount by which the sum of the cost of utilities and local property taxes for the project exceeds the project's "initial operating expense level." These operating subsidies may be made to a Section 236 project owner only to the extent that there are tenants residing in the project who pay more than 30 percent of their income for rent,[7] and the maximum amount of the operating subsidy payment authorized is the amount necessary to reduce the rental charges of those tenants who pay more than 30 percent of their gross income. Finally, no payment may be made unless the Secretary determines that the increased costs are reasonable and comparable to cost increases affecting other rental projects in the community. 12 U.S.C. § 1715z–1(f)(3).[8]

The amendment further provided for the establishment of an initial operating expense level for each project; for any project assisted under a contract entered into prior to the date of the enactment of the Housing and Community Development Act of 1974, the Secretary was directed to establish the level not later than 180 days after the effective date of the Act. 12 U.S.C. § 1715z–1(g). Because Meyler Park was an existing project at the time of the enactment of the 1974 amendments, the initial operating expense level should have been established not later than February 18, 1975.

---

6. In the Budget Control Act of 1974, P.L. No. 93–344, 88 Stat. 297, Congress provided for a change in the beginning of the fiscal year from July 1, to October 1. *Id.* at section 501, 88 Stat. 321. This change is to be effective this year, 1976. Thus, fiscal 1976 ended on June 30, 1976, but fiscal year 1977 did not begin until October 1, 1976. The quarter year beginning July 1, 1976 and ending September 30, 1976 is termed the "transition Quarter."

7. This limitation is set at 25 percent if the tenants pay their own utility costs.

8. 12 U.S.C. § 1715z–1(f)(3) provides:
   For each project there shall be established an initial operating expense level, which shall be the sum of the cost of utilities and local property taxes payable by the project owner at the time the Secretary determines the property to be fully occupied, taking into account anticipated and customary vacancy rates. At any time subsequent to the establishment of an initial operating expense level, the Secretary is authorized to make, and contract to make, additional assistance payments to the project owner in an amount up to the amount by which the sum of the cost of utilities and local property taxes exceeds the initial operating expense level, but not to exceed the amount required to maintain the basic rentals of any units at levels not in excess of 30 per centum, or such lower per centum not less than 25 per centum as shall reflect the reduction permitted in clause (ii) of the last sentence of paragraph (1), of the income of tenants occupying such units. Any contract to make additional assistance payments may be amended periodically to provide for appropriate adjustments in the amount of the assistance payments. Additional assistance payments shall be made pursuant to this paragraph only if the Secretary finds that the increase in the cost of utilities or local property taxes is reasonable and is comparable to cost increases affecting other rental projects in the community.

Congress also created a specific reserve fund for the Secretary's use in making "operating subsidy" payments. Prior to the 1974 amendments, a project owner was required to pay to the Secretary all rental charges collected in excess of basic rental charges. 12 U.S.C. § 1715z–1(g). These funds were deposited in a special revolving fund which could be utilized by the Secretary for the liquidation of contracts to make interest reduction payments subject to the limitation contained in any appropriation act. Under the 1974 amendment, the amount contained in the reserve fund could be used by the Secretary to make "operating subsidy" payments only.[9] The conditions under which the Secretary could spend the reserve's funds, as of February 18, 1975, constitutes the major aspect of the controversy before us now.

## MOOTNESS

■ Initially, the Secretary argues that the controversy became moot on July 1, 1976. On that date, 89 of the 99 units of Meyler Park became recipients of a Section 8 assistance contract from HUD. 42 U.S.C. § 1437f. Because no tenant may be required under Section 8 to pay more than 25 percent of his income for rent, those tenants so covered are no longer eligible for the "operating subsidy" program. The remaining ten units of Meyler Park were already covered by Section 23 [42 U.S.C. § 1421b], which applies the same 25 percent of income limitation. But the fact that the Meyler Park residents are not presently eligible for the "operating subsidy" program does not resolve the question of the propriety of the District Court's Order of retroactive relief. That remains a live and important issue. *Powell v. McCormack,* 395 U.S. 486, 498, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Lidie v. State of California,* 478 F.2d 552, 554 (9th Cir. 1973). The resolution of the question necessitates the most careful study and comprehends all issues surrounding the "operating subsidy" program that have been properly raised.

## ANALYSIS

### I

■ The Secretary contends that she is vested with complete discretion in determining whether to implement the "operating subsidy" program. This contention, based primarily on the language of the statute and congressional action since the statute's enactment, has been flatly and unequivocally rejected by every court that has considered the question. *Carberry v. Hills,* Civil No. 76–251–F (D.Mass., March 8, 1976); *Campbell v. Hills,* Civil No. 75–471 (N.D.Ohio, Dec. 22, 1975); *Dubose v. Hills,* 405 F.Supp. 1277 (D.Conn.1975); *Folsom Gardens Action Comm. v. Hills,* Civil No. S–76–43 (E.D.Cal., Feb. 12, 1976); *Gertsch v. Hills,* 414 F.Supp. 15, (D.Utah, 1976); *Harrison v. Hills,* Civil No. 75–938 (W.D. Pa., Oct. 1, 1975); *Ross v. Community Services, Inc.,* 405 F.Supp. 831 (D.Md.1975), *aff'd,* 544 F.2d 514 (4th Cir. 1976). It is true that the language of Section 236(f)(3) is couched in precatory terms ("the Secretary *is authorized* to make and contract to make, additional assistance payments . . .,") (emphasis added), whereas the "deep subsidy" language of Section 236(f)(2) is mandatory ("the Secretary *shall make,* and contract to make additional assistance payments . . .") (emphasis added). However, from our review of the legislative history of the amendments, we conclude that the difference in language does not indicate that the Congress meant to give the Secretary unfettered discretion in respect to the payment of "operating subsidies." The difference may be more readily explained by the fact that "deep subsidy" payments are directed only toward projects initiated after the passage of the

---

9. P.L. No. 94–378 (August 9, 1976), 90 Stat. 1095, changed the law by providing that after October 1, 1976, the reserve fund could be used to make contract payments for a number of other housing programs. However, we are not concerned here with the disposition of the reserve fund subsequent to the effective date of P.L. No. 94–378. For a discussion of this issue, *see Dubose v. Hills,* 420 F.Supp. 399 (D.Conn., 1976). The question of the manner in which the new law affects this litigation is discussed *infra.*

1974 amendments, while the "operating subsidies" subsection is applicable to both new and *existing* projects. The following passage from the Senate Report explains the failure of the Congress to use mandatory language in drafting the "operating subsidies" amendment:

> While anxious to deal with [the problem of increased costs], the Committee also of course desired to develop a provision which would focus upon the real problem cases, and could be tightly administered, and would not simply reward poor management. . . .

S.R. No. 693, 93rd Cong., 2d Sess. (1974), reported in 3 U.S.Code Cong. & Admin. News 4303 (1974).

Thus, we agree with all of the other courts that the Congress did not intend to commit the award of "operating subsidies" to the complete discretion of the Secretary.

Neither do we find the Secretary's claim that Congress has approved her action any more persuasive than did the court in *Ross v. Community Services, Inc., supra.* The subsequent legislative action can at most be termed ambiguous, but a fair reading supports the view that Congress has specifically *disapproved* the Secretary's actions.[10] Therefore, in light of the abundant and uniform decisions that the discretion of the Secretary in administering the "operating subsidy" program is narrowly limited, we see no useful purpose in further discussion of this issue. *See* particularly, *Dubose v. Hills, supra; Ross v. Community Services,*

*supra; Ross v. Community Services, Inc.,* 396 F.Supp. 278 (D.Md.1975); *Underwood v. Hills,* 414 F.Supp. 526 (D.D.C.1976).

## II

The Secretary further argues that her decision not to implement the "operating subsidy" program was a permissible exercise of discretion because implementation of the program would conflict with other statutory housing goals. The thrust of her argument is a familiar one, *i. e.,* that her resources are limited and she must therefore choose between full implementation of several worthwhile programs. She points to the decision in *Commonwealth of Pennsylvania v. Lynn,* 163 U.S.App.D.C. 288, 501 F.2d 848 (1974), as controlling. However, *Lynn* is inapposite. To discuss this case is unnecessary because there is no conflict between the "operating subsidy" program and any other housing program.

As explained above, the usual method by which HUD obligates the Government is through "contract authority." The Secretary takes the position that she is unable to proceed with the "operating subsidies" program because she lacks the requisite contract authority.[11] She argues that since only $71 million[12] of unreserved contract authority remains, it is impossible for her to fund both the interest reduction program, estimated to cost $58.9 million, and the "operating subsidy" program, estimated to require $51.4 million.

---

**10.** On April 12, 1976, the Senate Committee on Banking, Housing and Urban Affairs, which authored the operating subsidy program and is the Senate committee charged with overseeing its implementation, stated:

> The reserve [fund] is required under Section 236(g) of the Act to be used for additional operating assistance payments under the terms specified in Section 236(f)(3). The Committee is concerned that HUD has not yet implemented this provision of the 1974 Act. S.R. No. 94–749, 94th Cong.2d Sess. 10 (1976), U.S.Code Cong. & Admin.News 1976, pp. 2837, 2846.

**11.** The most obvious reason for holding that contract authority is not the only method by which the Secretary can carry out her programs, is found in the language of subsection

(f)(3) wherein appears the phrase "make and contract to make." Congress obviously contemplated payments not under contract, else it would not have made such a superfluous distinction.

**12.** The latest complete figures with which this court has been presented show $90.1 million of unreserved contract authority as of September 1975. The "deep subsidy" program, which is concededly mandatory, has been estimated by the Secretary to require $29 million. We do not accept the assertion of the Secretary in her reply brief that only $30.6 million of contract authority remains, because it is unclear whether the reduction is due to the funding of the interest reduction or "deep subsidy" programs.

■ We disagree with the Secretary's assumption that the reserve fund is subject to contract authority limitations. The text of the statute, as amended in 1974,[13] makes no reference whatsoever to contract authority. Rather, it provides that the sums are "to be used" by the Secretary to make "operating subsidies." Thus, in our view, the reserve fund which contained $40 million at the time the present suit was instituted,[14] and which was then required to be spent only on "operating subsidies,"[15] was immediately available for the Secretary's use. We hold that it was an abuse of discretion for the Secretary arbitrarily to refuse to apply these funds for their prescribed use. The legislative history is consistent with the position we have taken.[16] For a further analysis of this issue, see *Dubose v. Hills, supra,* at 1285–86.

■ The Secretary next contends that even if the reserve fund were available, the third sentence of 12 U.S.C. § 1715z–1(g) required that she make a determination, prior to making any "operating subsidy" payments, that the balance in the reserve fund was adequate. Accordingly, because she found the fund inadequate, she did not make payments to Meyler Park. Since we hold that a determination of adequacy is not a prerequisite to use of the fund for "*operating subsidies,*" we do not reach the question of sufficiency of monies in the fund. Our decision that a finding of adequacy is not required by the pertinent law is based on the text of the statute itself. We find little assistance in the legislative history.

The third sentence of Subsection (g) reads as follows:

During any period that the Secretary determines that the balance in the reserve fund is adequate to meet the estimated additional assistance payments, such excess charges shall be credited to the appropriation authorized by subsection (i) of this section and shall be available until the end of the next fiscal year for the purpose of making assistance payments with respect to rental housing projects receiving assistance under this section. 12 U.S.C. § 1715z–1(g).

If we were to accept the Secretary's interpretation of the quoted provision, we would be required to hold that Congress employed the phrases "additional assistance payments" and "assistance payments with respect to rental housing projects receiving assistance under this section," synonymously. Aside from the fact that such an interpretation would ascribe to the draftsmen a very cumbersome use of language, we see a

---

**13.** 12 U.S.C. § 1715z–1(g) provides:

The project owner shall, as required by the Secretary, accumulate, safeguard, and periodically pay to the Secretary all rental charges collected in excess of the basic rental charges. Such excess charges shall be credited to a reserve fund to be used by the Secretary to make additional assistance payments as provided in paragraph (3) of subsection (f) of this section. During any period that the Secretary determines that the balance in the reserve fund is adequate to meet the estimated additional assistance payments, such excess charges shall be credited to the appropriation authorized by subsection (i) of this section and shall be available until the end of the next fiscal year for the purpose of making assistance payments with respect to rental housing projects receiving assistance under this section. For the purpose of this subsection and paragraph (3) of subsection (f) of this section, the initial operating expense level for any project assisted under a contract entered into prior to August 22, 1974, shall be established by the Secre-

tary not later than 180 days after August 22, 1974.

**14.** The Secretary contends that the reserve fund lawfully contained only $22 million because of $18 million erroneously collected. The amount of the fund is not here material, inasmuch as there certainly remains a sufficient sum to grant the relief requested by the plaintiffs.

**15.** Congress changed the requirement that the reserve fund be used only for "operating subsidies" in P.L. No. 94–378, 90 Stat. 1095 (August 9, 1976). The provision, enacted after the institution of the present suit, allows the reserve fund to be used for a number of housing programs.

**16.** *See* S.R. No. 93–693, 93d Cong., 2d Sess. (1974); H.Conf.R. No. 93–1279, 93d Cong., 2d Sess. (1974). Both are reported in 3 U.S.Code Cong. & Admin.News 4273, 4302–04, 4375 (1974).

definite congressional intention to give distinctly different meanings to "assistance payments" and "*additional* assistance payments" in 12 U.S.C. § 1715z–1. (Emphasis supplied.) The former refers to interest reduction payments, while the latter refers to "deep" and "operating subsidies." [17] Therefore, under the language of Subsection (g), there is a significant difference between the two terms as they are used in the quoted sentence. Under our interpretation, the reserve fund is immediately available for use in implementing the "operating subsidy" program, and only if the Secretary determines that the fund is adequate to meet that program's needs, may she *thereafter* credit excess charges to the appropriation authorized in Subsection (i).[18]

### III

■ We now turn to the Secretary's contention that any claim for retroactive relief is necessarily barred by the doctrine of sovereign immunity. We have concluded that sovereign immunity has been fully waived by Congress in 12 U.S.C. § 1702 (1934). The Supreme Court in *Federal Housing Administration, Region 4 v. Burr,* 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940), stated that the words "sue and be sued in their normal connotation embrace all civil process incident to the commencement or continuance of legal proceedings . . .," and concluded that the FHA (now HUD) was subject to garnishment. The Court went beyond *Burr* in *R.F.C. v. Menihan Corp.,* 312 U.S. 81, 84, 61 S.Ct. 485, 487, 85 L.Ed. 595 (1940) in stating, "We apply the further principle that the words 'sue and be sued' normally include the natural and appropriate incidents of legal proceedings. . . ." [19] Additionally, we have ourselves held in *State of Washington v. Udall,* 417 F.2d 1310

(9th Cir. 1969), that a suit against a government officer in his official capacity was not a suit against the sovereign if the officer's powers were limited by statute and his actions were *ultra vires.* *See also Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). We further stated that certain kinds of affirmative relief may be barred if such relief would work an intolerable burden on government functions, outweighing any consideration of private harm. That we did not mean always to preclude actions for damages is made clear by a following sentence: "In such cases a party must be denied all judicial relief other than that available in a possible action for damages. . . ." [20] *Id.* at 1318. The present case falls squarely within the *ultra vires* exception to sovereign immunity, and *State of Washington v. Udall, supra,* authorizes the relief granted by the District Court, whether such relief is described as "damages" or "equitable restitution."

■ While we have concluded that the District Court had the *power* to order retroactive relief, we must consider the propriety of its action. The language of subsection (g) doubtless mandated the establishment of an initial operating expense level for Meyler Park not later than February 18, 1975, but subsection (f)(3) appears to give the Secretary broad discretion as to the timing of payments. It provides that "[a]t any time subsequent to the establishment of an initial operating expense level, the Secretary is authorized to make, and contract to make, additional assistance payments. . . ." However, we noted in an earlier portion of this opinion our reasons for concluding that the precatory language of subsection (f)(3) was not conclusive. We therefore hold that Congress in-

---

17. *Compare* 12 U.S.C. § 1715z–1(b), (i)(2), (i)(3) with 12 U.S.C. § 1715z–1(f)(2), (f)(3).

18. The present effect of subsection (g) is left substantially in doubt by the passage of P.L. No. 94–378, 90 Stat. 1095 (August 9, 1976). Our discussion is based on the statute as it existed at the time when the District Court was obliged to reach its decision.

19. *Menihan* held that an award of costs would not be barred by sovereign immunity.

20. We think that the opinion of the Supreme Court in *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), clearly indicates that the retroactive relief sought must be treated as the functional equivalent of a suit for damages.

tended for the Secretary to aid *some* projects by February 18, 1975.

■ Upon making this determination, we would ordinarily remand a matter such as this to the District Court with instructions that the Secretary be ordered to determine whether Meyler Park qualified for an operating subsidy during the period in question. But this two-step procedure was followed in *Ross v. Community Services, Inc.,* 396 F.Supp. 278 (D.Md.1975), and upon remand the Secretary adamantly refused to pay the plaintiffs a subsidy, adhering to her view that the statute gave her absolute unfettered discretion to decide whether to award an operating subsidy to a particular project. The district judge in *Ross* held that the secretary had abused her discretion by refusing to grant the subsidy and awarded relief. In order to avoid a similar delay in this case, we choose now to affirm the District Court's Order in its every aspect. Considering the circumstances of the respective parties, the fact that the program should have been implemented long ago, and the fact that the record discloses no reason why the appellees should not qualify under the statute, it would constitute an abuse of discretion for the Secretary not to grant an operating subsidy that has been ordered.

### P.L. No. 94–378

■ One final matter requiring our attention is the Secretary's claim that the passage of P.L. No. 94–378, 90 Stat. 1095, 1096 (August 9, 1976) prohibits the result we have reached. The Act appropriates a fixed sum of money for various purposes (including the "operating subsidy" program) and contains the following proviso:

> *Provided,* That excess rental charges credited to the Secretary in accordance with section 236(g) of the National Housing Act [12 U.S.C. 1715z–1(g)], as amended, shall be available, in addition to amounts appropriated herein, for the payments on contracts entered into pursuant to the authorities enumerated above.

The Secretary argues that the above language makes it clear that contract authori-

ty is required before any of the money in the reserve fund may be utilized. We can answer this argument no better than did the court in *Dubose v. Hills,* 420 F.Supp. 399 (D.Conn., 1976):

> The premise of this argument is that the reserve fund can be spent only pursuant to contract. In my earlier consideration of this issue, I reviewed the statutory language and the legislative history and concluded that "direct payments can be made out of the reserve fund, not pursuant to any contract and, hence, without reducing the Secretary's available contract authority." However, the defendants now argue that the proviso of Public Law 94–378, which states that the reserve fund shall be available "for the payments on contracts entered into pursuant to the authorities enumerated above," supports their position that the reserve fund can only be spent pursuant to contract authority.
>
> The defendants place too much weight upon the proviso's reference to contracts. The language merely recognizes that many of the programs enumerated in Public Law 94–378, including interest reduction payments under the Section 236 program, do require the obligation of contract authority prior to the expenditure of appropriations. However, I conclude that the proviso does not indicate that the reserve fund can *only* be spent pursuant to contract. (420 F.Supp. at 401–402.)

Our holding on this issue is thoroughly fortified by the Conference Report explaining the Committee's action in restoring the proviso (after it had been struck by the Senate):

> Amendment No. 3: Restores language proposed by the House and stricken by the Senate making available any excess rental charges under Section 236(g) of the National Housing Act to liquidate contract obligations for a number of programs under the housing payments account.
>
> *The committee of conference is agreed that this action shall not prejudice any*

*suit now or hereafter before the courts in this area.* (Emphasis added).

H.R. Report No. 94–1362, 94th Cong., 2d Sess. (1976). It therefore quite clearly appears that Congress did not intend that P.L. No. 94–378 should forestall such relief as was here ordered by the District Court.

AFFIRMED.