Joseph Jerome SCALISE, et
al., Plaintiffs,

v.

Edwin MEESE III, Attorney General of
the United States, et al., Defendants.

No. 87 C 7898.

United States District Court,
N.D. Illinois, E.D.

June 3, 1988.

Anne M. Burke, Chicago, Ill., for plaintiffs.

Thomas P. Walsh, Asst. U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiffs Joseph Scalise and Arthur Rachel are in a jail in a land far, far away.

They want to come home. The Attorney General of the United States has the power to grant their wish, but he refuses to exercise it. Plaintiffs seek a writ of mandamus ordering the Attorney General to establish regulations which would govern the grant or denial of their request, as well as an order finding the Attorney General's refusal a violation of their due process rights. They have moved for summary judgment on their complaint. This court has jurisdiction under both the general federal subject matter jurisdiction statute, 28 U.S.C. § 1331, and the federal mandamus statute, 28 U.S.C. § 1361.[1] For the reasons set forth below, plaintiffs' motion will be granted and the writ of mandamus will issue.

## BACKGROUND

Five years ago, plaintiffs, citizens of the United States, went to London, England for a trip. While they were there, they armed themselves with a firearm and robbed a jewelry store. They escaped with around $3.6 million dollars in jewels, including the famous Marlborough Diamond.

They did not remain free for long. The British authorities soon caught up with them, though not with the stolen jewels. Plaintiffs were tried and convicted in the Old Bailey for violations of the 1968 Theft Act of the United Kingdom and § 18(1) of the United Kingdom's Firearm's Act of 1968. The British judge sentenced them to fifteen years in prison, with their terms of imprisonment commencing August 6, 1984.

Under British law, plaintiffs will be eligible for release in July, 1993, although they will apparently be eligible for "parole license", a term with which this court is not familiar, in July of this year.

In any case, plaintiffs do not wish to remain in England. Beginning shortly after their incarceration, they began inquiring into the possibility of their being transferred to the United States to serve out their sentences. On July 1, 1985, the United States and the United Kingdom, in conjunction with a number of other countries, ratified the Convention on the Transfer of Sentenced Persons ("the Convention"). This treaty, which went into effect August 1 of that year, provides for the transfer of foreign prisoners from the country of their incarceration to their home countries.

In the United States, authority for the implementation of the Convention is vested with the Attorney General under the Transfer of Offenders To and From Foreign Countries Act ("the Act"), P.L. No. 95–144, 91 Stat. 1212, 18 U.S.C. § 4100 et seq.[2] The Act provides, in pertinent part:

Section 4102. *Authority of the Attorney General*

The Attorney General is authorized—

(1) to act on behalf of the United States as the authority referred to in the treaty;

(2) to receive custody of offenders under a sentence of imprisonment, on parole, or on probation who are citizens or nationals of the United States transferred from foreign countries and as appropriate confine them in penal or correctional institutions, or assign them to the parole or probation authorities for supervision;

. . . . .

(4) to make regulations for the proper implementation of such treaties in accordance with this chapter and to make regulations to implement this chapter . . .

After the Convention went into effect, plaintiffs wrote letters to both the British and the American authorities requesting transfer to American prisons. The British

---

**1.** 28 U.S.C. § 1361 provides:

The district court shall have original jurisdiction over any action in the nature of mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty owed to plaintiff.

**2.** Although the Act was passed and went into effect in 1977, all parties to this case agree that the Act governs the Convention. *See* 18 U.S.C. § 4101 ("'(k) 'treaty' means a treaty under which

a foreign offender sentenced in the courts of one country may be transferred to the country of which he is a citizen or national for the purposes of serving the sentence."); H.Rep. No. 95–720, 95th Cong., 1st Sess., *reprinted in* 1977 U.S.Code Cong. & Admin.News 3146, 3146 ("The purpose of [the Act] is to provide the implementation procedures for offender transfer treaties with Mexico and Canada *as well as for similar future treaties.*") (Emphasis added).

authorities told them that England would agree to their transfer, provided that the United States did likewise. The Justice Department, acting on behalf of the Attorney General, however, declined their request. In a letter from Phillip T. White, Director of the Criminal Division of the Office of International Affairs of the Justice Department, to Anne M. Burke, attorney for Plaintiff Joseph Scalise, the Justice Department explained its decision:

> This is in reply to your letter of August 29, 1986. The principal factors we took into consideration in making the decision not to request Mr. Scalise's transfer were: the relative seriousness of his offense; his extensive criminal record; the manner of his return to the United Kingdom; his "A" security classification in the United Kingdom, the highest security category; and, the likelihood that a transfer would not further his rehabilitation.

Plaintiffs contend that the Attorney General has violated the Act and the Due Process Clause by failing to promulgate regulations and guidelines governing requests for transfer under the Convention, and by refusing to give them a hearing on their requests.

The Attorney General, in turn, contends that the Act does not require him to promulgate regulations or guidelines, and that he may deal with such requests on an ad hoc basis pursuant to internal (and undisclosed) criteria. He insists that his decision in this case was well within the permissible discretion granted to him by the Act. The Attorney General also argues that the Convention and the Act create no legitimate expectations for American prisoners incarcerated abroad and, accordingly,

that his refusal to provide plaintiffs a hearing on their requests cannot violate the Due Process Clause.

 What the Attorney General does not do, however, is to provide this court with any evidentiary material to oppose plaintiffs' summary judgment motion. The Attorney General states: that plaintiffs mailed the stolen jewels to America before they were caught and that the British authorities are continuing their investigation to locate the jewels; that plaintiffs have extensive criminal histories; that they have demonstrated no remorse for their conduct; that they would be immediately eligible for parole if they were transferred to this country; and that they would be a threat to their communities. Yet, he presents not a single shred of evidence to support these factual assertions. Such unsupported assertions are inadequate in a motion for summary judgment, and therefore will not be considered by this court in its resolution of the motion.[3]

## DISCUSSION

Plaintiffs' complaint and motion for summary judgment can best be divided into three parts. The first part seeks a writ of mandamus ordering the Attorney General to promulgate regulations and guidelines as allegedly required by the Act. The second asks this court to review and reverse the Attorney General's administrative decision to deny their transfer requests. The third seeks a declaration that the Attorney General has violated their due process rights, and an order granting them an administrative hearing on their request.

### The Writ of Mandamus

For a court to issue a writ of mandamus, or to grant relief in the nature of the writ,[4]

---

3. The court notes that the Attorney General did not indicate that it needed more time before responding to plaintiffs' motion.

4. Section 10 of the Administrative Procedure Act, 5 U.S.C. § 706 provides in part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the

> terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed....

Like the traditional writ of mandamus, this provision may be invoked to compel agency action when the requirements for the common law writ have been satisfied. *See Conservation Law Foundation of New England, Inc. v. Clark,* 590 F.Supp. 1467 (D.C.Mass.1984).

against an executive agency is an extraordinary step.

In this circuit, it is well-established that mandamus jurisdiction may only be invoked when the following three elements are present:

"(1) a clear right in the plaintiff to the relief sought;

(2) a plainly defined and peremptory duty on the part of the defendant to do the act in question;

(3) no other adequate remedy available."

*Homewood Professional Care center, Ltd. v. Heckler,* 764 F.2d 1242, 1251 (7th Cir. 1985) (*quoting Americana Healthcare Corp. v. Schweiker,* 688 F.2d 1072, 1084 (7th Cir.), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1982)); *Beckless v. Heckler,* 622 F.Supp. 715, 720 (D.C.Ill. 1985). These elements are addressed in turn.

### 1. Plaintiffs' Rights

■ Although the Attorney General asserts that plaintiff is not entitled to mandamus because the Act does not impose a duty on the Attorney General to promulgate regulations, the Attorney General does not argue that, if such a duty exists, plaintiffs lack the right to enforce it. This court agrees with the Attorney General's implied concession that the Act gives plaintiff a private right to enforce the terms of both the Act and the Convention. *See, e.g.,* Letter of Submittal from Secretary of State to President, Recommending Transmittal of the Convention to the Senate, April 30, 1984 at 3 ("The purpose of the Convention is to facilitate the transfer of foreign prisoners to their home countries by establishing procedures that can be initiated *by prisoners* who prefer to serve their sentences there.") (emphasis added), adopted in Letter of Transmittal from President to Senate Recommending Ratification, May 7, 1984; *Id.* at 6 ("[The Convention] is fully consistent with the provisions of Public Law 95–144, 18 U.S.C. sec 4100 *et seq.,* enacted by Congress to implement treaties relating to the transfer of offenders to or from foreign countries. No new legislation would be required."); H.Rep. No. 95–720, 95th Cong., 1st Sess., *reprinted in* 1977

U.S.Code Cong. & Admin.News 3146, 3155 (Congress intends that the Attorney General will, in most cases, consent to the receipt of Americans from abroad pursuant to the Act "if the offender requests ... such transfer"); *see also Pfeiffer v. United States Bureau of Prisons,* 615 F.2d 873, 876 (9th Cir.1980) ("[The] sole purpose of the treaty on the Execution of Penal Sentences [between the United States and Mexico] is to permit persons convicted in foreign countries to serve their incarcerations in the country of which they are citizens."). Thus, if the Act imposes a duty on the Attorney General to promulgate regulations, plaintiffs are entitled to compel him to abide by it.

### 2. The Attorney General's Duty

■ In determining whether the Act imposes on the Attorney General "a plainly defined and peremptory duty" to promulgate regulations and guidelines for the transfer of prisoners, this court's only function is to give effect to Congress' intent. *United States v. Markgraf,* 736 F.2d 1179, 1182 (7th Cir.1984), *cert denied,* 469 U.S. 1199, 105 S.Ct. 1154, 84 L.Ed.2d 308 (1985). The Seventh Circuit has explained how the court must approach its task:

In determining [Congress'] intent, courts customarily look to several factors: the language of the statute; the legislative history; and the interpretation given by the administrative agency charged with enforcing the statute.

*Id.* at 1182.

As set forth above, the statute provides that the Attorney General "is authorized ... to make regulations for the proper implementation of such treaties in accordance with this chapter and to make regulations to implement this chapter." 18 U.S.C. § 4102. Whether this language mandates the promulgation of such regulations, or merely permits it, is not clear. *Cf. Abrams v. Hill,* 547 F.2d 1062 (9th Cir. 1976) (just because statute states that government officer "is authorized" to take certain action does not necessarily mean that the officer has discretion to refuse to act), *cited with approval, United States v.*

*Markgraf,* 736 F.2d 1179 (7th Cir.1984) (statute stating that Secretary of Agriculture "may permit" the deferral of certain loans did not give Secretary the authority to refuse to implement the statute, but gave him the discretion to deny deferral to some borrowers). Thus, this court must look to the Act's legislative history.

Doing so clarifies the picture. The House Report adopted as the official legislative history of the Act provides, in pertinent part, as follows:

Section 4102. *Authority of the Attorney General.*

This section designates the Attorney General as the "authority" referred to in the treaties and gives him the necessary authority to implement the treaties with regard to receiving American offenders from a foreign country who are serving a sentence of imprisonment, or who are on probation or parole. It also authorizes the Attorney General to transfer Federal offenders who are serving a sentence of imprisonment, or who are on probation or parole, to the country of which they are citizens or nationals.

*Standards for Attorney General Consent*

Under existing treaties and this legislation, the Attorney General must agree to the receipt or transfer of an offender. The committee was concerned that the Attorney General exercise his discretion on this concern with care. *In most cases, and possibly almost all cases, he should agree to any receipt or transfer,* if the offender requests or voluntarily consents to such transfer. However, they [sic] may be an unusual situation, involving possibly a dangerous offender, where the Attorney General should not agree to the return of the offender, and his immediate eligibility for parole, to the United States. Similarly, there may be an unusual situation, involving an individual in American persons [sic], who for

matters of future law enforcement, continuing investigation, or other national interests, should not be sent to his home country. *The committee therefore expects the Attorney General to promptly establish regulations and to provide standards and guidelines which will govern the exercise of his consent as to his consent to receive or transfer offenders.*

H.Rep. No. 95–720, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin. News 3146, 3155 (emphasis added).

■■■ The Attorney General's position— his interpretation of the statute he is "charged with enforcing"—that the Act permits him to deal with transfer requests on an ad hoc basis is thus totally unfounded. Congress clearly intended that the Attorney General would grant such requests in almost all cases, and would promulgate regulations and guidelines to deal with those "unusual situation[s]" in which denial of such requests might be warranted. Furthermore, the Attorney General reproduced for this court a portion of the very provision of the Act's legislative history which clarifies that, although he retains discretion as to the *content* of such regulations, he does not with respect to his duty to *promulgate* them. Thus, there can be no doubt that the Attorney General is aware of his duty and has consciously chosen not to fulfill it.

Accordingly, this court finds a plain and peremptory duty on the part of the Attorney General to promulgate regulations, a duty sufficiently clear to invoke this court's mandamus jurisdiction. *Estate of Smith v. Heckler,* 747 F.2d 583 (10th Cir.1984) (mandamus was proper remedy to compel Secretary of Health and Human Resources to promulgate regulations where statute imposed a clear duty on her to do so); *see also Flynn v. Schultz,* 748 F.2d 1186, 1194 (7th Cir.1984), *cert. denied,* 474 U.S. 830, 106 S.Ct. 94, 88 L.Ed.2d 77 (1985).[5]

---

5. "Mandamus may be used to compel the performance of a ministerial duty when the obligation to perform it is plainly defined. Further, 'it also is employed to compel action, when refused, in matters involving judgment or discretion, but not to direct the exercise of discretion in a particular way nor to direct the retraction or the reversal of action already taken in the exercise of either.'" *Flynn v. Schultz,* 748 F.2d at 1194 (*quoting Interstate Commerce Com-*

### 3. Adequacy of Alternative Remedies

The final element plaintiffs must satisfy to obtain mandamus relief is the requirement that there exist no adequate alternative remedies. The Attorney General does not argue that such alternative remedies are available, and this court can find none.

To be sure, plaintiffs can and, as discussed below, do challenge as an abuse of discretion the Attorney General's determination that they are not entitled to transfer. Thus, one could argue, plaintiffs have an alternative route available to them in challenging the Attorney General's decision.

Yet, this court's finding below that the Attorney General has indeed abused his discretion does not, and cannot " 'afford[ ] [plaintiffs] *full relief* as to the very subject matter in question.' " *Holmes v. United States Board of Parole*, 541 F.2d 1243 (7th Cir.1976) (emphasis added) (*quoting Carter v. Seamans*, 411 F.2d 767, 773 (5th Cir. 1969)). The proper course for this court to follow in reversing the Attorney General's decision is to remand the case to the Attorney General for further action in accordance with this court's ruling. *Flynn v. Schultz*, 748 F.2d 1186, 1194 (7th Cir.1984), *cert. denied*, 474 U.S. 830, 106 S.Ct. 94, 88 L.Ed.2d 77 (1985). Thus, unless this court also compels the Attorney General to promulgate regulations and guidelines to govern plaintiffs' requests, plaintiffs will again be forced to seek transfer to this country without the benefit of the generally-applicable regulations and rules which Congress clearly contemplated would guide the Attorney General in this and similar cases.

Accordingly, this court will issue a writ of mandamus ordering the Attorney General to promulgate regulations and guidelines to govern requests from American citizens and nationals incarcerated abroad for transfer to American prisons pursuant to the Convention and similar treaties.

*mission v. Humboldt Steamship*, 224 U.S. 474, 484, 32 S.Ct. 556, 559, 56 L.Ed. 849 (1952))

### *Review of the Attorney General's Decision*

■ The Administrative Procedure Act ("the APA") gives the federal courts the power to review final agency action unless federal "statutes preclude judicial review" or "agency action is committed to agency discretion by law." 5 U.S.C. § 701 *et seq.* The Attorney General "is an 'agency' subject to review jurisdiction under the APA." *Dellums v. Smith*, 573 F.Supp. 1489, 1498 (N.D.Cal.1983), *rev'd on other grounds*, 797 F.2d 817 (9th Cir.1986). Further, the Attorney General does not contest, and this court finds, that the Act neither specifically precludes judicial review of the Attorney General's decisions regarding prisoner transfer requests, nor commits these decisions to his sole and unreviewable discretion.

■ On the contrary, Congress made quite clear that the Attorney General's discretion with regard to prisoner transfer decisions should be carefully circumscribed. The Attorney General must grant such requests in all but the most "unusual situations," and must define by regulation what those situations will involve. Implicit in this grant of authority is the recognition that, if the Attorney General abuses his discretion, courts will have the power to review, and if necessary reverse him. *See Turner v. United States Parole Commission*, 810 F.2d 612 (7th Cir.1987); *Alvarez v. Longboy*, 697 F.2d 1333 (9th Cir.1983).

Thus, the APA review provisions govern plaintiffs' appeal of the Attorney General's decision to deny their requests for transfer. Section 10(e) of the APA, 5 U.S.C. § 706, informs this court's review:

> [T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of agency action. The reviewing court shall—
>
> . . . . .

(other citations omitted).

(2) hold unlawful and set aside agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . .

 Because the Attorney General acted without the guidance of regulations specifically required by the Act, his denial of plaintiffs' requests constitutes an abuse of discretion, and requires reversal, as a matter of law. *See Industrial Holographics, Inc. v. Donovan*, 722 F.2d 1362, 1367 & n. 9 (7th Cir.1983) (failure to promulgate and adhere to regulations can amount to arbitrary and capricious conduct because of the "danger of arbitrary action in the absence of articulated standards"); *cf. White v. Roughton*, 530 F.2d 750, 754 (7th Cir.1976) (failure of township supervisor to promulgate rules and regulations governing welfare eligibility violated due process because it placed "virtually unfettered discretion in [the supervisor] and his staff"). However, even if the Act did not specifically require that the Attorney General adopt regulations in carrying out his duties under the Act, this court would still be forced to reverse his decision here.

In denying plaintiffs' requests, the Attorney General necessarily determined that their request fell within Congress' contemplation of "unusual situation[s]" in which denial of transfer might be appropriate. The Attorney General points to several factors he employed in reaching this conclusion:

(1) the relative seriousness of the offense for which plaintiffs are incarcerated;

(2) plaintiffs' "extensive" criminal history;

(3) the fact that plaintiffs will be immediately eligible for parole if transferred to an American prison; and

(4) the unlikelihood that transfer would facilitate plaintiffs' rehabilitation.

Yet, as noted earlier, the Attorney General has not provided this court with any evidentiary material supporting these "findings", or indicated how they compare with other transfer request cases. The only cases available to this court for comparison are those few published opinions in which prisoners have been granted transfer back to America and then attacked, through habeas corpus, the legality of their incarceration here. While those cases are unlikely to constitute a representative sample of the Attorney General's decisions on transfer requests, this court notes that many of them involved crimes more serious than those for which plaintiffs are currently incarcerated.[6] *See, e.g., Tavarez v. U.S. Attorney General*, 668 F.2d 805 (5th Cir. 1982) (manslaughter); *Boyden v. Bell*, 631 F.2d 120 (9th Cir.1980) (smuggling heroin); *Kanasola v. Civiletti*, 630 F.2d 472 (6th Cir.1980) (murder); *Wilden v. Fields*, 510 F.Supp. 1295 (D.Wis.1981) (murder).

This is not to say that there are no circumstances in which an American convicted of armed robbery abroad can be denied transfer back to the United States. But in the absence of clearly articulated reasons and factual support for a denial, such a deviation from past practice compels this court to find the Attorney General's decision arbitrary and capricious, and an abuse of discretion in this case. *See West Chicago, Illinois v. United States Regulatory Commission*, 701 F.2d 632, 648 (7th Cir.1983) (where agency proceeds through informal adjudication, it must clearly state and support its reasons for its decision).

Because, as noted above, this court finds it appropriate to remand this case to the Attorney General for further proceedings consistent with this ruling, a few comments are appropriate on the Attorney General's

---

**6.** A letter from the American Consul, Embassy of the United States in London, to plaintiff Scalise, dated June 28, 1985, though obviously not binding on the Attorney General, provides an interesting view of at least one American official regarding the sorts of "unusual situation[s]" in which an American's transfer request might be denied:

[G]eneral policy for both the British and Americans is not to withhold consent for transfer except for extenuating circumstances; for example, *a mass murderer.* (Emphasis added).

application of the factors noted above to plaintiffs' requests.

█ To the extent that the Attorney General relied on the above factors to determine the danger that plaintiffs might pose to the American public if transfer were granted, he acted appropriately. Although Congress specified only the seriousness of the crime for which the prisoner is incarcerated, and his eligibility for parole, as factors which could bring a case within the "unusual situations" in which transfer might be denied, see H.Rep. No. 95–720, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin.News 3146, 3155, this court cannot say that the Attorney General abused his discretion in looking to other factors—i.e. plaintiffs' past criminal record—to determine plaintiffs' future threat.

█ In his arguments to this court, however, the Attorney General indicated that he also employed the above factors in reaching a determination that granting the transfer requests would contradict the Convention's salutory purpose of improving bilateral relations between transferring nations. Gov. Mem. at 5 ("[T]he transfer and possible parole of the plaintiffs would harm rather than enhance foreign relations between our countries."); see also H.Rep. No. 95–720, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin.News 3146, 3148–49 (setting forth the three primary benefits of the Act: (1) increased probability or rehabilitation of offender; (2) improved bilateral relations between the transferring countries; (3) humanitarianism). This argument turns the Act and the Convention on their heads. Granting requests can improve bilateral relations; it cannot impair them. The host country always retains the right to decline a request for transfer and keep the prisoner in its own jails. Thus, to the extent the Attorney General rejected plaintiffs' request because he felt granting it would somehow impair relations between the United States and the United Kingdom, he clearly overstepped his discretion under the Act.

█ This Court also finds problems in the Attorney General's reference to the negligible rehabilitory benefits of bringing plaintiffs back to this country. The legislative histories of the Act and the Convention clearly indicate that Congress and the President presumed that permitting an American incarcerated abroad to serve out his sentence in America would enhance the chance of rehabilitation. See, e.g., H.Rep. No. 95–720, 95th Cong., 1st Sess., reprinted in 1977 U.S.Code Cong. & Admin.News 3146, 3149 ("Offender rehabilitation, which is one of the primary objectives of U.S. penal policy, is facilitated as a result of execution of penal sentences in an offenders home country.") (emphasis added). Nothing in these histories in any way suggests that the Attorney General may determine, on a case-by-case basis, whether he believes that transfer would serve such a function. Thus, the Attorney General also abused his discretion when he unilaterally made the determination that transfer would not facilitate rehabilitation, and then used this finding as a reason to deny plaintiffs' requests.

*Procedural Due Process*

█ The Constitution "prohibits the federal government from depriving a person of life, liberty, or property without due process of law." *Campbell v. Miller,* 787 F.2d 217, 222 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 673, 93 L.Ed.2d 724 (1987). Liberty interests can be found in the Constitution itself, in statutes, or in administrative regulations. However, once it is determined that such a protected interest exists, the Constitution alone prescribes the procedures the government must follow in the course of depriving a person of it. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

This court could find no authority, and the parties supplied none, on the liberty interests, if any, of American citizens incarcerated abroad who seek transfer to the United States. Nevertheless, there appears no reason why they should be treated differently from Americans imprisoned in American jails who claim the right to be, or not to be, transferred from one prison to

another. *Cf. Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981) (American living in West Germany could challenge, under Due Process Clause, federal government's procedures in revoking his passport). And in those cases the law is quite clear: Where a statute or administrative regulation places limits on the discretion of administrative officials with regard to transfer decisions, a liberty interest arises and the Due Process Clause comes into play. *Mitchell v. Hicks*, 614 F.2d 1016 (5th Cir.1980); *see Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (prisoner had no due process right to remain in Hawaii where state placed no substantive limits on authority of state officials to transfer him to California or any other state).

 This court has already discussed at length the limits the Act places on the Attorney General's discretion with regard to transfer requests. Americans incarcerated abroad thus have a legitimate expectation that their requests will be granted, subject only to exceptions which the Attorney General is authorized to prescribe. Thus, this court finds that the Act creates a liberty interest in these American citizens which the Attorney General can only deny through the procedures mandated by the Due Process Clause.

 Of course, just what these procedures encompass is not an easy question. Not only is a pre-deprivation hearing impossible to guarantee, but a post-deprivation one may be as well. At a minimum, however, the Attorney General should provide a prisoner whose request has been denied with both a specific explanation and elaboration of the grounds for his decision, and an opportunity to rebut them, *see Campbell v. Miller*, 787 F.2d at 224 ("The Supreme Court has repeatedly stated that procedural due process is a non-Euclidean concept critically related to time, place and circumstances."), either in writing or, where the prisoner desires, in person through a representative of his choosing.

In this case, the Attorney General responded to plaintiffs' requests with the single-paragraph letter reproduced above. This response leaves this court without a meaningful basis for reviewing his decision. More importantly, however, it leaves plaintiffs, in prisons thousands of miles away, at a loss to understand why their government has condemned them to serve out their sentences in foreign jails when, as far as they can tell, Americans who have committed far more egregious crimes have been afforded the opportunity to serve their penance in their homeland. Such action on the part of the Attorney General falls short of even the limited procedural requirements to which plaintiffs are entitled.

*Summary*

This court has determined that the Attorney General has violated its duty under the Act to promulgate regulations setting forth standards and guidelines to govern the requests of Americans incarcerated abroad to be transferred to an American prison. This court has also found that the Attorney General acted arbitrarily and capriciously, and abused his discretion, in denying the request of the plaintiffs in this case. Finally, this court has concluded that the Attorney General deprived plaintiffs of due process of law in denying their requests under the Act without a sufficient explanation and elaboration of his decision and without affording them an opportunity to rebut.

## CONCLUSION

Accordingly, this court orders the Attorney General to promulgate regulations pursuant to its authority under the Act within a reasonable time. This court further orders the Attorney General, after the establishment of these regulations, to determine the eligibility of plaintiffs for transfer to America, to inform the plaintiffs of his decision, and, if negative, to afford the plaintiffs an opportunity to respond to this decision either in writing or, if plaintiffs choose, through personal representatives in this country.